IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 04-CV-2429-BNB-PC

THE ESTATE OF GREGORY LOUIS HERRING, By and through, CAROLYN MOORE, Personal Representative, et al.,

Plaintiffs,

v.

THE CITY OF COLORADO SPRINGS, a municipal entity, et al.,

Defendants.

## BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

COME NOW Defendants, the City of Colorado Springs ("City"), Luis Velez ("Chief Velez"), Gary Darress, Rory Carroll, and Brent Ambuehl, by and through the Office of the City Attorney, and pursuant to Fed.R.Civ.P. 56 hereby submit the following brief in support of motion for summary judgment:

## STATEMENT OF FACTS

On May 2, 2003, Scott Elder made a call to 911 to report a disturbance being caused by Gregory Herring ("Herring") at the Winfield Apartments. Exhibit A, Affidavit of Scott Elder, ¶2. Mr. Elder heard a banging noise coming from outside of his apartment. *Id.* at ¶4. When Mr. Elder looked out he saw Herring banging on other apartment doors. *Id.* Mr. Elder then observed Herring cross the parking lot and approach Mr. Elder's apartment building. *Id.* Mr. Elder then heard Herring banging on doors beneath his apartment, stomp up the stairs and begin to violently pound on Mr.

Elder's door.  *Id.* at ¶¶ 4-5.  Perceiving Herring to be over six feet tall and approximately 240 pounds, Mr. Elder feared that Herring would break open the door and harm Mr. Elder.  *Id.* at ¶¶5-7. Fearing for his own safety, Mr. Elder retreated to his balcony and called 911.  *Id.* at 7.  It was Mr. Elder's intention to jump from his balcony if Herring broke into the apartment.  *Id.* at ¶7.

While Mr. Elder was speaking with the 911 operator, Herring left Mr. Elder's door and went to Herring's own apartment.  *Id.* at ¶8.  Mr. Elder then watched as Herring's three children ran screaming from Herring's apartment.  *Id.*  Mr. Elder also observed Herring throwing a chair out of Herring's apartment window.  *Id.*  Mr. Elder reported this information to the 911 operator and ended the call.  *Id.* at ¶9.

A short time later, Mr. Elder called back to 911.  *Id.* at ¶10.  Mr. Elder reported that Herring was breaking out his apartment windows and throwing items out of the windows.  *Id.* at ¶11.  Mr. Elder also reported that Herring was nude, his arms were slashed and bleeding, and he had a cut on his abdomen.  *Id.* at ¶12.

Mr. Elder ended this call to 911 and then observed a fire engine from the Colorado Springs Fire Department ("CSFD") and an ambulance from American Medical Response ("AMR") arrive and park in the apartment complex parking lot.  *Id.* at ¶14; Exhibit E, Affidavit of Firefighter/Paramedic Clark Gaddie, ¶3; Exhibit F, Affidavit of Firefighter Lerry Armstead, ¶3.

Colorado Springs Police Officers Gary Darress, Rory Carroll and Brent Ambuehl were dispatched to respond to Mr. Elder's calls.  While enroute to the Winfield Apartments, Officer Darress was informed that Herring had been beating on a neighbor's door, that Herring was naked, bleeding from cuts on his arm and abdomen, and was throwing items out of Herring's own apartment

window.   Affidavit B, Affidavit of Officer Gary Darress, ¶3.   Upon arrival at the Winfield Apartments, Mr. Elder directed Officer Darress to Herring's apartment.  Exhibit A, ¶¶14-15; Exhibit B, ¶5.

Upon approaching Herring's apartment, Officer Darress observed a broken window and numerous household items that had been thrown out of the broken window.  Exhibit B, ¶6.  Officer Darress then looked through the broken window and into the apartment.  Officer Darress observed blood on the walls, items that had been thrown all over the apartment, and that the inside of the apartment looked "like a bomb had gone off."  *Id.* at ¶7.  Officer Darress then heard a grunting or moaning noise coming from inside the apartment.  *Id.* at ¶9.  At this time, Mr. Elder yelled to Officer Darress something about Herring's children.  *Id.* at ¶10.  Officer Darress then walked around the outside of Herring's apartment and observed that every window in the apartment had been broken out, and there was blood throughout the other rooms in the apartment.  *Id.* at ¶11.  Officer Darress then contacted Herring through a broken window in the back of the apartment by introducing himself.  Officer Darress observed that Herring was naked, had a two-and-one-half to three inch cut on his right arm, had a cut on his abdomen, and was leaning out of a broken window with his abdomen pressed against the broken glass in the window frame.  *Id.* at ¶¶12-14.  When Officer Darress contacted Herring, Herring continued to throw items out of the window.  *Id.* at ¶13.  Because of the cuts on Herring, Officer Darress thought that Herring was intentionally injuring himself, and possibly attempting to commit suicide.  *Id.* at ¶14.

While Officer Darress was contacting Herring, Officers Rory Carroll and Brent Ambuehl arrived at the Winfield Apartments.  Officer Carroll had been informed that Herring had been

banging on an apartment door and trying to get inside the apartment, that Herring was nude, was banging on other apartment doors, that children had run from Herring's apartment, that furniture and clothing were being thrown from Herring's apartment, and that Herring was tearing up his own apartment.  Exhibit C, Affidavit of Officer Rory Carroll, ¶3.  Officer Ambuehl was informed that Herring had cuts on his arms and abdomen, was banging on apartment doors, and that children were living with Herring.  Exhibit D, Affidavit of Officer Brent Ambuehl, ¶3.

When Officers Carroll and Ambuehl arrived at the Winfield Apartments, Officer Carroll observed blood on one or two apartment doors.  Exhibit C, ¶5.  At this time, Mr. Elder also directed Officers Carroll and Ambuehl to Herring's apartment.  Exhibit A, ¶16; Exhibit C, ¶5.

Upon arriving at Herring's apartment, Officers Carroll and Ambuehl observed that every window in Herring's apartment had been broken out, Herring was throwing items out of a broken window, Herring was yelling, children's clothes, furniture, etc., had been thrown out of the apartment, and broken glass was everywhere.  Exhibit C, ¶6; Exhibit D, ¶7.  In addition, Officer Ambuehl observed that Herring was naked, bleeding, and appeared to be harming himself.  This was evident because of the blood all over Herring's abdomen and body, and the blood on the sidewalk. Exhibit D, ¶8.  Officers Carroll and Ambuehl observed Officer Darress speaking with Herring and trying to calm Herring down.  Exhibit C, ¶6; Exhibit D, ¶7.

At this time, Officer Darress believed that Officers Carroll and Ambuehl could gain entry into Herring's apartment while Officer Darress distracted Herring.  Exhibit B, ¶15.  It was Officer Darress' intent that Officers Carroll and Ambuehl subdue Herring so that Herring would not continue to harm himself, so that medical attention could be administered to Herring, and to keep Herring

smw/herring/pldgs/001

from jumping out the broken window and further harming himself or others.  *Id.* at ¶¶15 and 43.  It was Officer Darress' opinion at the scene that Herring needed immediate help.  *Id.* at ¶43.

Officer Darress then directed Officers Carroll and Ambuehl to go in the front door of the apartment.  Exhibit B, ¶16; Exhibit C, ¶7, Exhibit D, ¶10.  Officer Ambuehl went to the front door while Officer Carroll waited at the corner of the apartment building.  Exhibit C, ¶7; Exhibit D, ¶10.  The front door was locked, so Officers Carroll and Ambuehl returned and conveyed this to Officer Darress.  Officer Darress then directed Officers Carroll and Ambuehl to kick in the front door.  Exhibit B, ¶16; Exhibit C, ¶7, Exhibit D, ¶10.  Officers Carroll and Ambuehl then kicked in the front door and entered the apartment.  Exhibit C, ¶8; Exhibit D, ¶11.

Officer Carroll did not know if anyone else was in the apartment with Herring that may have been  in danger and needing help.  Officer Carroll heard that kids had run from the apartment, but did not know if anyone was still in the apartment.  Exhibit C, ¶31.  It was Officer Carroll's opinion at the scene that if anyone else was in the apartment they would have been in danger and in need of immediate help.  *Id.* at ¶32.  Given all the blood that Officer Carroll observed, Officer Carroll did not know if it was all from Herring or from someone else as well.  *Id.*

Officer Ambuehl had been informed that Herring had children but did not know if the children were in the apartment with Herring.  Exhibit D, ¶34.  Officer Ambuehl entered Herring's apartment to help any children who may have been present.  It was Officer Ambuehl's opinion at the scene that if any children were in the apartment they would have been in danger and in need of immediate help.  *Id.* at ¶35.

Upon entering the apartment, Officers Carroll and Ambuehl observed that the apartment was in shambles. Various items had been thrown everywhere and the Officers had to maneuver over the items to get through the apartment. Exhibit C, ¶9. Officer Carroll went directly to the back bedroom where Herring was located while Officer Ambuehl checked the remainder of the apartment. Exhibit C, ¶10; Exhibit D, ¶¶12-13. Herring was the only person in the apartment. Exhibit D, ¶13.

To get to the back bedroom where Herring was located Officer Carroll had to go through a hallway which led to the bedroom and bathroom. Exhibit C, ¶10. Officer Carroll entered the bedroom and stopped by the entrance to the bathroom. *Id.* Officer Carroll observed that the bathroom floor was covered with water and blood, that Herring was naked, had blood all over his arm and abdomen, and there was blood all over the apartment walls. *Id.*

When Officer Carroll entered the bedroom Herring saw him. Herring then threw a broken shelf and a bottle at Officer Carroll. Exhibit C, ¶11. At this time, Officer Ambuehl had made his way to the bedroom. Officer Ambuehl positioned himself at the doorway between the hall and the bedroom. Exhibit D, ¶14. Herring then approached Officer Carroll at which time Officer Carroll ordered Herring to stop. Exhibit C, ¶11. Herring continued to approach Officer Carroll at which time Officer Carroll sprayed Herring one time with a one second burst of O.C. spray in Herring's left eye. Exhibit B, ¶17; Exhibit C, ¶11; Exhibit D, ¶15. Herring was sprayed because of his aggressive behavior and because he would not stop. Exhibit C, ¶11. In response to the O.C. spray, Herring covered his eyes, turned away for one second, looked back at Officer Carroll, stated that "we are all going to die," and charged into Officer Carroll. Exhibit B, ¶18; Exhibit C, ¶12; Exhibit D, ¶15.

smw/herring/pldgs/001

Believing that Herring meant what he said, Officer Carroll again ordered Herring to stop. Herring did not stop and attacked Officer Carroll.  Exhibit B, ¶18; Exhibit C, ¶¶13-14; Exhibit D, ¶15.  Herring grabbed Officer Carroll by the left shoulder and pushed him back causing the door between the hall and bedroom to slam shut.  Herring and Officer Carroll then fell to the bathroom floor. Exhibit C, ¶14; Exhibit D, ¶15.

At this time, Officer Carroll was alone with Herring in the bathroom.  Exhibit C, ¶14. Herring then grabbed Officer Carroll's testicles and squeezed.  *Id.* at ¶14.  Screaming in pain Officer Carroll struck Herring with his fist in the middle of Herring's back and ordered Herring to let go of his testicles.  *Id.*  Herring did not let go so Officer Carroll struck Herring again with his fist on Herring's back.  *Id.*  Herring then let go and tried to get up.  *Id.*  Herring again stated, "we are all going to die."  *Id.*

During this time, Officer Ambuehl was able to force open the door to the bedroom.  Exhibit D, ¶15. Officer Ambuehl observed that the toilet, door and bathtub had blood all over them, and the bathroom floor was wet and bloody.  Exhibit D, ¶17.  Officer Ambuehl then grabbed Herring's feet to assist Officer Carroll.  *Id.* at ¶18.  Herring was fighting so hard that he was throwing Officers Carroll and Ambuehl around the bathroom.  *Id.* at ¶19.

Officer Darress came around the apartment and entered the apartment through the front door. Exhibit B, ¶19. Upon entering the apartment Officer Darress saw a blanket.  Officer Darress grabbed the blanket with the intent of wrapping it around Herring to subdue him.  Exhibit B, ¶19.  Officer Darress then entered the bathroom and attempted to wrap the blanket around Herring.  This did not work and the blanket went flying off into the bathtub.  Exhibit B, ¶23; Exhibit D, ¶20.  At this time,

Herring was face down on the bathroom floor.  Officer Darress was on Herring's right side by Herring's head and shoulders, Officer Carroll was on Herring's left side by Herring's head and shoulders, and Officer Ambuehl was at Herring's feet.  Exhibit B at ¶¶22-23; Exhibit C at ¶16.

All three Officers were now struggling with Herring and trying to restrain him.  Exhibit C, ¶17.  Herring's left heel then came up and kicked Officer Ambuehl in the left eye.  Exhibit D, ¶21.  Officer Carroll then struck Herring on Herring's shoulder with his fist.  Exhibit C, ¶17.  Officer Darress took out his handcuffs and handed them to Officer Carroll, who was able to get Herring's left wrist cuffed.  Exhibit B, ¶24; Exhibit C, ¶17.  However, due to Herring fighting so hard Officer Carroll was unable to get the cuffs around Herring's right wrist.  Exhibit B, ¶24.  Herring was fighting so hard that he was physically lifting the Officers off of the floor.  *Id.*

During the struggle, Herring grabbed Officer Carroll's firearm holster.  This led Officer Carroll to believe that Herring was reaching for his gun.  Exhibit C, ¶18.  Herring then grabbed Officer Darress' testicles and squeezed.  Screaming in pain, Officer Darress struck Herring with the soft side of his fist in an effort to get Herring to let go of his testicles.  Exhibit B, ¶25.  Herring finally let go after being struck in the head five to six times.  *Id.*

Officer Carroll then tried to pull Herring's left arm behind Herring's back in an effort to control Herring's arms.  Exhibit C, ¶19.  However, Herring pulled Officer Carroll forward.  *Id.*  Officer Carroll then struck Herring on the shoulder with his fist.  *Id.*  At this time, Officer Carroll pulled out his PR-24 and put it under Herring's armpit and tried to pull Herring's arm back.  *Id.* at ¶20; Exhibit D, ¶23.  This maneuver was unsuccessful, so Officer Carroll gave the PR-24 to Officer Ambuehl to use under Herring's legs as a compliance maneuver.  *Id.*  This maneuver was also

unsuccessful, so Officer Ambuehl placed the PR-24 on the counter by the sink. *Id.* Officer Carroll then reached over to try to get Herring's right wrist cuffed. Exhibit C, ¶21. Herring then bit into Officer Carroll's left ring finger. Exhibit B, ¶26; Exhibit C, ¶21. Screaming in pain Officer Carroll struck Herring with his fist in the side of Herring's face and ordered Herring to let go of his finger. Herring did not let go, so Officer Carroll struck Herring again. Herring then let go of Officer Carroll's finger. Exhibit B, ¶26; Exhibit C, ¶22.

Officer Ambuehl then wedged his right knee into the side of Herring's right thigh and wedged his right leg against the wall for leverage in an attempt to restrain Herring's legs. Exhibit D, ¶24. However, this maneuver did not work. *Id.* At this time, Herring grabbed Officer Darress' PR-24 and pulled it out of the holder. Exhibit B, ¶27. Officer Darress fought Herring and was able to get the PR-24 back. *Id.* Herring continued to fight, so Officer Darress struck Herring in the head three to four times using a flat chop. *Id.* Herring was fighting so hard that Officer Darress thought Herring was on PCP. *Id.* at ¶28. Herring then bit into Officer Darress' right knee. *Id.* at ¶29. Officer Darress struck Herring with his fist on Herring's head approximately five times, ordering Herring to stop biting his knee. *Id.*

At this time, Officer Darress called for medical personnel to come in and assist. Exhibit B, ¶30. It was Officer Darress' belief that with more bodies Herring could be controlled and then medical assistance could be administered to Herring. *Id.* Herring continued to fight so hard that he was physically lifting the Officers off of the ground. *Id.* at ¶31. At this time, Officer Darress pressed his thumb into a pressure point on the side of Herring's neck in an attempt to get Herring to comply with commands to calm down. However, this maneuver had no effect. *Id.*

Officer Darress was then finally able to get the handcuff around Herring's right wrist so that both of Herring's hands were cuffed in front.  Exhibit B, ¶32; Exhibit C, ¶23.  Officer Darress again called for medical personnel to come in and assist.  Exhibit B, ¶33; Exhibit D, ¶25.

Herring then pushed himself and the Officers up off the floor so that Herring was now on his forearms and his upper body was off the floor, and he tried to roll over.  Exhibit B, ¶34; Exhibit C, ¶23.  Officer Darress believed that if Herring were able to get up it would be impossible to contain him.  Exhibit B, ¶35.  At this time, Officer Darress, while lying on top of Herring, pushed with his upper body on Herring's back in an attempt to get Herring back on his stomach.  *Id.*  Officer Carroll also struck Herring on the back with his fist and ordered Herring to get down.  Exhibit C, ¶23.  Herring again reached back and grabbed Officer Carroll's firearm holster.  *Id.* at ¶24.  Believing Herring was attempting to take his firearm, Officer Carroll placed his hand on his firearm to keep Herring from taking the firearm.  *Id.*

At this time, CSFD and AMR entered the apartment.  Exhibit B, ¶36; Exhibit C, ¶25; Exhibit D, ¶26; Exhibit E, ¶8; Exhibit F, ¶6.  When approaching the apartment, the Firefighters observed that blood was on the sidewalk and on other apartment doors, that the apartment windows were broken out, that debris was scattered outside of the apartment, and they could hear screaming coming from inside the apartment.  Exhibit E, ¶7; Exhibit F, ¶5.  Upon entering the apartment, the Firefighters observed that the apartment was in disarray, blood was everywhere, the three police Officers were fighting with Herring in the bathroom, Herring was naked, face down, yelling, cussing, and fighting the Officers.  Exhibit E, ¶¶8-9; Exhibit F, ¶6.  The Firefighters immediately assisted the police Officers and attempted to restrain Herring because the Officers were unsuccessful

smw/herring/pldgs/001

in controlling Herring, and for Herring's own safety so that medical attention could be administered to him.  Exhibit E, ¶11; Exhibit F, ¶8.

Because Herring could not be restrained, it was determined that medication should be administered to Herring.  At this time, an AMR paramedic prepared a syringe of 5 milligrams of Haldol and administered the Haldol into Herring's left buttock.  Exhibit B, ¶36; Exhibit C, ¶25; Exhibit D, ¶27, Exhibit E, ¶¶12-13; Exhibit F, ¶9.  However, this shot had no effect on Herring.  *Id.* The AMR paramedic then prepared a second 5 milligram shot of Valium and handed the syringe to Firefighter/Paramedic Gaddie.  Firefighter/Paramedic Gaddie then administered the Valium into Herring's left buttock.  A short time after the second shot was administered, Herring began to calm down.  Exhibit B, ¶36; Exhibit C, ¶26; Exhibit D, ¶¶28-29; Exhibit E, ¶14; Exhibit F, ¶10.  The Haldol and Valium were administered to Herring in order to assist in restraining Herring so that medical care could be provided to Herring.  These medications are routinely used for the safety of the subject individual, the officers, and firefighters involved.  Exhibit E, ¶15.

After Herring had calmed down, Firefighter/Paramedic Gaddie asked if Herring was breathing.  Exhibit B, ¶37; Exhibit E, ¶16; Exhibit F, ¶11.  Officer Darress checked Herring's pulse and confirmed that Herring was breathing.  *Id.*  Officers Darress, Carroll, and Ambuehl then left the bathroom and apartment to attend to their own injuries.  Exhibit B, ¶38; Exhibit C, ¶27; Exhibit D, ¶30; Exhibit E, ¶17.

After the Officers left the bathroom, the CSFD and AMR personnel rolled Herring onto his back and pulled him toward the doorway.  Exhibit E, ¶18.  Firefighter /Paramedic Gaddie then

smw/herring/pldgs/001

checked Herring's breathing using a stethoscope and noted that Herring had strong breath sounds. Firefighter/Paramedic Gaddie also discovered that Herring had a strong carotid pulse. *Id.*

A few minutes later, Herring stopped breathing. Exhibit E, ¶19. Firefighter/Paramedic Gaddie immediately checked Herring's pulse and discovered that Herring still had a strong carotid pulse. *Id.* Firefighter/Paramedic Gaddie then began ventilating Herring. *Id,* Exhibit F, ¶¶12-13. Herring was then placed on a backboard and rushed to the AMR ambulance. *Id.* Once at the ambulance, Firefighter/Paramedic Gaddie again checked Herring's pulse. At this time, Herring did not have a pulse so CPR was immediately begun. Exhibit E, ¶19. Herring was then transported to the hospital, where he subsequently died. *Id.*

## ARGUMENT

### I.      STANDARD OF REVIEW.

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Upon a motion for summary judgment, the moving party bears the burden of showing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The burden then shifts to the non-moving party to produce evidence creating a genuine issue of material fact to be resolved at trial. *Vitkus v. Beatrice Co.,* 11 F.3d 1535, 1539 (10th Cir. 1993). To avoid summary judgment, the non-moving party must present more than "a mere scintilla of evidence." *Id.* There must be enough evidence to allow a reasonable jury to find for the non-moving party. *Id.* The non-movant "may not rest upon mere allegations or

smw/herring/pldgs/001

denials" of the pleadings, *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), but must "set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." *Applied Genetics Intern., Inc., v. First Affiliated Securities Inc.,* 912 F.2d 1238, 1241 (10th Cir. 1990).

Qualified immunity is an affirmative defense against Section 1983 claims. *Quezada v. County of Bernalillo,* 944 F.2d 710, 718 (10th Cir. 1991). Its purpose is to shield public officials "from undue interference with their duties and from potentially disabling threats of liability," and to spare them the burden of going forward with trial. *Harlow v. Fitzgerald,* 457 U.S. 800, 806, 102 S.Ct. 2727, 2732, 73 L.Ed.2d 396 (1982). *See also Anderson v. Creighton,* 483 U.S. 635, 638, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). In all but the most exceptional cases, qualified immunity protects government officials performing discretionary functions from the burden of civil trials and from liability for damages. *Harris v. Board of Educ. of the City of Atlanta,* 105 F.3d 591, 595 (11th Cir. 1997).

Excessive force claims are analyzed under the Fourth Amendment's "objective reasonable standard," not under substantive due process principles. *Saucier v. Katz,* 533 U.S. 194, 204, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). *See also Graham v. Conner,* 490 U.S. 386, 396-97, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). This objective standard requires the court to ask "whether a reasonable officer in the same circumstances would have concluded that a threat existed justifying the particular use of force." *Graham,* 490 U.S. at 396-97. "Because police officers are often forced to make split-second judgments--in circumstances that are tense, uncertain, and rapidly evolving--about the amount of force that is necessary in a particular situation, the reasonableness

smw/herring/pldgs/001

of the officer's belief as to the appropriate level of force should be judged from that on-scene perspective." *Saucier,* 533 U.S. at 205 (internal citations omitted).  Use of the "20/20 vision of hindsight" is not permitted.  *Id.*  Rather, "deference to the judgment of reasonable officers on the scene" is given.  *Id.*  Therefore, the qualified immunity defense "embodies an 'objective reasonableness' standard giving a government agent the benefit of the doubt," provided that the conduct was not "so obviously illegal in the light of then-existing law that only an official who was incompetent or who knowingly was violating the law would have committed" the acts.  *Crosby v. Paulk,* 187 F.3d 1339, 1344 (11th Cir. 1999).

"In a suit against an officer for an alleged violation of a constitutional right, the requisites of a qualified immunity defense must be considered in proper sequence." *Saucier,* 535 U.S. at 200. *See also Schnurr v. Board of County Com'rs of Jefferson County,* 189 F.Supp.2d 1105, 1119 (D.Colo. 2001).  "After a defendant asserts a qualified immunity defense, the burden shifts to the plaintiff." *Medina v. Cram,* 252 F.3d 1124, 1128 (10th Cir. 2001).  The plaintiff must then satisfy a "heavy two-part burden" *Id.*  "The plaintiff must first establish 'that the defendant's actions violated a constitutional or statutory right.'"  *Id.*  "If the plaintiff establishes a violation of a constitutional or statutory right, he must then demonstrate that the right at issue was clearly established at the time of the defendant's unlawful conduct." *Id.*

To survive a motion for summary judgment, the plaintiff must show the right was "clearly established in a 'particularized' sense." *Anderson,* 483 U.S. at 640.  A plaintiff "must do more than identify in the abstract a clearly established right and allege that the defendant has violated it." *Pueblo Neighborhood Health Centers, Inc. v. Losavio,* 847 F.2d 642, 645 (10th Cir. 1988).  A

plaintiff "must articulate the clearly established constitutional right and the defendant's conduct which violated the right with specificity." *Albright v. Rodriguez,* 51 F.3d 1531, 1535 (10th Cir. 1995). *See also Walter v. Morton,* 33 F.3d 1240, 1242 (10th Cir. 1994) ("the plaintiff...has the burden to show with particularity facts and law establishing the inference that the defendants violated a constitutional right"). For the law to be clearly established, "there must be a Supreme Court or Tenth Circuit decision on point or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Medina v. City and County of Denver,* 960 F.2d 1493, 1498 (10th Cir. 1992). *See also Anderson,* 453 U.S. at 640 (a right is clearly established if the contours of the right are "sufficiently clear [so] that a reasonable official would understand that what he is doing violates that right"). One purpose of this requirement is notice; officials cannot "reasonably be expected to anticipate subsequent legal developments" nor "fairly be said to 'know' that the law forbade conduct not previously identified as unlawful." *Powell v. Mikulecky,* 891 F.2d 1454, 1456 (10th Cir. 1989). In short, "the record must clearly demonstrate the plaintiff has satisfied the heavy two-part burden; otherwise the defendants are entitled to qualified immunity." *Medina v. Cram,* 252 F.3d at 1128. "Consequently, in order for [Plaintiff's] claim to survive judgment, the record must contain facts that rebut the presumption of the officer's immunity from suit." *Id.* at 1130.

**II.    THE OFFICERS WERE CONFRONTED WITH AN EMERGENCY SITUATION GIVING RISE TO EXIGENT CIRCUMSTANCES. THEREFORE, THE OFFICERS WERE OBJECTIVELY REASONABLE IN ENTERING THE APARTMENT AND ARE ENTITLED TO QUALIFIED IMMUNITY.**

In Plaintiffs' fifth claim for relief they assert that the Officers' violated Herring's Fourth Amendment rights by entering Herring's apartment.  Complaint, ¶¶41-43.  Plaintiffs' claim that the Officers had been denied entry, had no warrant, had not attempted to obtain a warrant, and had no probable cause to believe exigent circumstances existed justifying entry.  *Id.* at ¶42.

It is not disputed that the Officers did not obtain a warrant before entering the apartment. However, "the Fourth Amendment does not bar police officers from making warrantless entries and searches when they reasonably believe that a person within is in need of immediate aid."  *Mincey v. Arizona,* 437 U.S. 385, 392, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978).  *See also Warden v. Hayden,* 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967) ("Fourth Amendment does not require police officers to delay in the course of an investigation if to do so would gravely endanger their lives or the lives of others");  *United States v. Wicks,* 995 F.2d 964, 970 (10th Cir. 1993) ("officers may...conduct a warrantless search if they believe that their own lives or the lives of others are at risk").  Therefore, emergency situations involving endangerment to life fall within the exigent circumstances exception to the warrant requirement.  *Wicks,* 955 F.2d at 970.

The basic elements of the exigent circumstances exception are that:

> (1) the law enforcement officers must have reasonable grounds to believe that there is immediate need to protect their lives or others or their property or that of others, (2) the search must not be motivated by an intent to arrest and seize evidence, and (3) there must be some

> reasonable basis, approaching probable cause, to associate an
> emergency with the area or place to be searched.

*United States v. Smith,* 797 F.2d 836, 840 (10th Cir. 1986).   In determining whether exigency

existed, the court examines the circumstances "as they would have appeared to prudent, cautious,

and trained officers."   *United States v. Anderson,* 154 F.3d 1225, 1233 (10th Cir. 1998).   "The

question is not whether one of the Plaintiffs was actually at risk or in need of aid, but whether the

Defendant Officers were reasonable in believing that exigent circumstances existed." *Foutz v. City*

*of West Valley City,* 345 F.Supp.2d 1272, 1276 (D.Utah 2004).

 In the present case, the Officers had reasonable grounds to believe that there was an

immediate need to protect the life of others.   The Officers responded to a report by a neighbor that

there was a nude male pounding on apartment doors, including the neighbor's, so hard the neighbor

feared the male would break open the door, that the male was breaking out his own apartment

windows, was throwing items out of the broken window, that his arms were slashed and bleeding,

that his abdomen was cut, and that children had run screaming from the male's apartment.   Exhibit

A, ¶¶4-12.   Upon arrival, Officer Darress observed that every window in the apartment had been

broken out, items had been thrown onto the ground outside, there was blood on the walls in the

rooms throughout the apartment, and that the inside of the apartment looked like a bomb had gone

off. Exhibit B, ¶¶6-11.  Upon contacting Herring, Officer Darress observed that Herring was naked,

had cuts on his arm and abdomen, and was leaning against broken glass in the window frame.   *Id.*

at ¶¶12-14.   Upon Officer Carroll's arrival, Officer Carroll observed blood on apartment doors,

Herring was throwing items out of the apartment window, the apartment windows had been broken

out, and he was informed by Officer Darres that blood was everywhere.  Exhibit C, ¶¶5-6 and 32.

When Officer Ambuehl arrived, Officer Ambuehl observed that all the apartment windows had been

broken out, Herring was throwing items out of a window, Herring was naked, bleeding and there

was blood all over Herring's abdomen, body and the sidewalk.  Exhibit D, ¶¶6-8.

    The statements made by the neighbor regarding Herring violently beating on doors, Herring

appearing to be injured, and children having run screaming from Herring's residence coupled with

the Officers' personal observations of the broken windows, debris on the ground, blood on doors,

apartment walls and the sidewalk, as well as Herring's own injuries and the destroyed condition of

the apartment all support the Officers' reasonable belief that someone in the apartment was in need

of immediate aid, and thus exigent circumstances existed.  Confronted with this evidence, the

Officers were objectively reasonable in concluding that either Herring, children, or someone else

in the apartment could have been seriously injured.  *See Foutz,* 345 F.Supp.2d at 1277.

    The undisputed evidence reflects a concern on the part of all three Officers that someone in

the apartment may have been in danger and in need of immediate aid.  It was Officer Darress'

opinion at the scene that Herring was injuring himself and in need of immediate help.  Officer

Darress' intent was to subdue Herring so that medical aid could be administered to Herring.  Exhibit

B, ¶43.  Officer Carroll was concerned that someone other than Herring could have been in the

apartment.  It was Officer Carroll's opinion at the scene, given all the blood, that if someone else was

in the apartment with Herring they would have been in danger and in need of immediate aid.  Exhibit

C, ¶¶31-32.  Officer Ambuehl was concerned that children may have been in the apartment with

Herring.  Officer Ambuehl had been informed that Herring had children and it was Officer

Ambuehl's opinion that if any children were in the apartment they would have been in danger and in need of immediate aid.  Exhibit D, ¶¶34-35.

The Officers were not motivated by an intent to arrest and seize evidence.  Indeed, the Officers were motivated by an intent to help whomever was in the apartment and either assure their safety, or assure that medical care could be provided.  *See Foutz,* 345 F.Supp.2d at 1277.

The same facts justifying the Officers' belief that there was an immediate need to protect the lives of others also provide a reasonable basis, approaching probable cause, to associate an emergency with the area or place to be searched.  Based upon the undisputed facts, the Officers had objectively reasonable grounds to believe that an emergency situation existed justifying a warrantless entry into the apartment to provide assistance to the occupants or to assure their safety.  *See Foutz,*  345 F.Supp.2d at 1277.  The existence of blood, broken windows, and other signs of destruction provide probable cause for an officer's reasonable belief that an emergency exists.  *See Tierney v. Davidson,* 133 F.3d 189, 198 (2nd Cir. 1998) ("The absence of blood, overturned furniture or other signs of tumult" did not render the officer's belief that danger existed unreasonable and did not require the officer "to withdraw and go about other business, or stand watch outside the premises listening for the sounds of splintering furniture"); *United States v. Brown,* 64 F.3d 1083, 1086 (7th Cir. 1995) ("We do not think that the police must stand outside an apartment, despite legitimate concerns about the welfare of the occupant, unless they can hear screams.  Doubtless outcries would justify entry, but they are not essential").

The Officers' choice to enter the apartment was objectively reasonable.  As such, the Officers are entitled to qualified immunity.  "Such immunity is given not only for the protection of the

officers, but also to protect victims of crime." *Fletcher v. Town of Clinton,* 196 F.3d 41, 49 (1st Cir. 1999).  "Permitting suit against officers who have acted reasonably when there is reason to fear would create exactly the wrong incentives.  Indeed, if the officers had done nothing, and [someone] had been injured, they would have faced the threat of suit."  *Id.* at 51.

### III.    THE OFFICERS' USE OF FORCE WAS OBJECTIVELY REASONABLE UNDER THE CIRCUMSTANCES.  THEREFORE, THEY ARE ENTITLED TO QUALIFIED IMMUNITY.

In Plaintiffs' sixth claim for relief they claim that the Officers' use of force was objectively unreasonable given the totality of the circumstances existing at the time.  Complaint, ¶48.  As previously discussed, it was objectively reasonable for the Officers to enter the apartment.  The pertinent question now is whether the force used by the Officers, given the force used by Herring against the Officers, was reasonable.  Applying the appropriate reasonableness standard, it cannot be held that the Officers' actions were so deficient that no reasonable officer could have acted in the same way.

After Officers Carroll and Ambuehl entered the apartment Officer Carroll proceeded to the bedroom, where Herring was located, while Officer Ambuehl checked the remainder of the apartment for other people.  Exhibit C, ¶10, Exhibit D, ¶¶12-13.  Upon Officer Carroll entering the bedroom, Herring became aggressive.  Herring threw items at Officer Carroll and then approached Officer Carroll.  Exhibit C, ¶11.  After Herring would not stop as ordered, Officer Carroll sprayed Herring one time with O.C. spray. *Id.*  A reasonable officer in Officer Carroll's position could have believed that Herring was threatening the officer's safety by his violent acts and failure to stop when ordered.  Further, an officer may use force in self-defense when threatened with physical harm.  *See*

20

*Tennessee v. Garner,* 471 U.S. 1, 11, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985) (deadly force may be used if "officer has probable cause to believe that the suspect poses a threat of serious physical harm either to the officer or to others"); *Romero v. Board of County Com'rs.,* 60 F.3d 702, 704 (10th Cir. 1995) ("An officer's use of deadly force in self-defense is not constitutionally unreasonable"). Officer Carroll's use of force in self-defense was not deadly, and was reasonable under the circumstances.

Herring then charged and attacked Officer Carroll.  Exhibit B, ¶18, Exhibit C, ¶¶12-14; Exhibit D, ¶15.  At this time, the physical fight escalated and became increasingly intense.  The situation was clearly "rapidly evolving."  There was no time for the Officers to reflect as Herring became increasingly violent.  *See Graham,* 490 U.S. at 307 ("officer's actions are not to be assessed with 20/20 hindsight" when faced with the need to make instantaneous decisions).  Officers Darress and Ambuehl then came to Officer Carroll's aid and all three Officers fought to restrain Herring. Exhibit B; Exhibit C; Exhibit D.  While it is true that the Officers struck Herring, each act of force used by the Officers was in response to Herring's violent actions.  Herring grabbed the Officers' testicles and squeezed, bit the Officers, reached for the Officers' PR-24 and gun, and continually tried to get up to further attack the Officers.  In short, the Officers reasonably responded to Herring's attacks.  *Id.*

The present case is directly on point with the case of *Caricofe v. Mayor and City Council of Ocean City, Maryland,* 32 Fed.Appx. 62 (4th Cir. 2002).  *Caricofe* involved an incident where a motel desk clerk called the police to report that a large naked man was in the hallway on the seventh floor jumping around, banging himself against the walls, and banging on guestroom doors.  Officer

Howard arrived and observed Caricofe acting like he was "strung out on some kind of drug." Officer Howard decided that Caricofe needed to be detained before someone got hurt, so he called for back-up. Officer Howard then attempted to engage Caricofe in conversation, but received no response.

Sergeant Braeuninger and Officer Jones soon arrived. The officers decided to subdue Caricofe because he was a danger to himself, other hotel guests and the officers, and then call for medical assistance. Officers Howard and Jones approached Caricofe and placed a handcuff on each wrist and tried to bring the cuffs together behind Caricofe's back. Caricofe threw the officers off of him, stood up, and began to swing his arms around. At this time, all of the officers sprayed Caricofe with pepper spray, but the spray had no effect. Caricofe then advanced towards the officers and pinned Officer Howard up against the wall. Officers Jones and Howard struggled with Caricofe and Sergeant Braeuninger called for more help. The officers then began striking Caricofe with their batons on his buttocks and legs. Caricofe then ran down the stairs, depsite the fact that Officer Jones was hitting him in the shin with the baton.

Caricofe ran into the parking lot. The officers tried to tackle Caricofe and eventually took Caricofe down to his hands and knees. At this time, other officers had arrived on scene. Pepper foam was then used on Caricofe, with no effect. Caricofe then stood up and shed four officers who were on him. Officer Townsend then began to strike Caricofe with his baton across the left thigh. Officers Skarpac and Engstron also struck Caricofe with the batons on his lower legs. Caricofe then ran away. Seveal officers then converged on Caricofe and took him to the ground. The officers struggled with

Caricofe and were finally able to handcuff him and put a violent prisoner restraining device on his legs.

Caricofe continued to struggle, so the officers held him down by leaning and kneeling on him. Eventually, Caricofe stopped moving. At this time, Officer Alban confirmed that Caricofe was breathing. However, while waiting for the paramedics to arrive, Caricofe stopped breathing. The paramedics performed CPR on Caricofe, however Caricofe died. Caricofe suffered injuries to his head, neck, torso, upper and lower extremities, and had a laceration to the top of his head.

Caricofe's parents commenced a 42 U.S.C. §1983 action claiming that the police officers used excessive force, and that the officers were improperly trained and supervised. The court held that the officers "were faced with a situation in which a large and exceptionally strong man was acting erratically and violently, placing at risk not only himself, but also hotel guests and the police officers. The officers necessarily made a split-second judgment that the man needed to be restrained and then proceeded with this effort, escalating their force only when the previous level of force proved ineffective." *Id.* at 66-67. "This sequence of events demonstrates a reasoned and restrained approach, rather than unreasonableness. That Caricofe died after the struggle is most tragic, but it cannot be said that this was from any *unreasonable* conduct on the part of the officers." *Id.* at 67. (Emphasis in opinion).

In the present case, Officers Darress, Carroll, and Ambuehl were faced with a situation whereby Herring was acting violently, both within his apartment and previously outside of his apartment. The Officers did not know if any other people were inside the apartment with Herring. However, the Officers did know that Herring was injuring himself. The Officers made a split-second

judgment to enter the apartment to aid Herring and anyone else in the apartment, and to prevent Herring from leaving the apartment and placing themselves and others at risk.  The Officers at no time resorted to deadly force, and only used the amount of force necessary to respond to Herring's violent acts.  As in *Caricofe,* this approach was reasonable under the circumstances.  Plaintiffs have therefore failed to establish that the Officers violated any Fourth Amendment rights.  As such, the Officers are entitled to qualified immunity.

IV.     **PLAINTIFFS HAVE FAILED TO ALLEGE ANY CONDUCT BY THE CITY OF COLORADO SPRINGS OR ITS EMPLOYEES WHICH VIOLATED A CONSTITUTIONAL RIGHT.  THEREFORE, LIABILITY CANNOT ATTACH TO THE CITY.**

In Plaintiffs' first claim for relief they allege that the City failed to properly train or supervise its employees regarding contact and interaction with the mentally ill, use of force on the ill, and in the use of chemical sprays.  Plaintiffs' claim that these training and supervision failures constitute a custom, practice or policy of the City.  Complaint, ¶25.  It appears that the Plaintiffs are basing their claims against the City on the acts of the Officers.

Liability does not attach to a municipality pursuant to §1983 for the acts of its employees unless the plaintiff can prove:  (1)  that a municipal employee committed a constitutional violation, and (2) that a municipal policy or custom was the moving force behind the constitutional deprivation. *See Monell v. Department of Social Services*, 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *Meyers v. Oklahoma County Bd. Of County Com'rs*, 151 F.3d 1313, 1316 (10th Cir. 1998).

"It is well established, therefore, that a municipality cannot be held liable under §1983 for the acts of an employee if it is found that the municipal employee committed no constitutional violation."

smw/herring/pldgs/001

*Meyers*, 151 F.3d at 1316.  As previously discussed, the Officers did not commit a constitutional violation.  Therefore, Plaintiffs have failed to meet the requisite predicate showing of an underlying constitutional violation.  As such, the City cannot be held liable.

In addition to no constitutional violation having occurred, Plaintiffs have also failed to establish that any injury came about due to a custom, practice or policy of the City.  A failure to train is a violation of §1983 only when the city's "failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be thought of as a city 'policy or custom' that is actionable under §1983."  *City of Canton v. Harris*, 489 U.S. 378, 389, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989).  The deficiency in policy, training or supervision must be related closely to the ultimate injury.  *Id.* at 391.

Plaintiffs' allege, in a conclusory fashion, that the City failed to properly train its employees regarding interacting and use of force on the mentally ill.  Plaintiffs' claim that these training deficiencies are upon information and belief.  Complaint, ¶25.  However, Plaintiffs fail to show that said inadequate training actually occurred.  Plaintiffs merely make the bald assertion.  This unsupported claim is insufficient to demonstrate deliberate indifference on the part of the City.  Further, under the facts and circumstances of this case, the Officers had to act as they did given Herring's injuries, and the possibility of others being in danger.  Therefore, Plaintiffs have not shown any obvious need for more training, such that the absence of that training can be said to reflect deliberate indifference on the part of the City.  *Jenkins v. Wood*, 81 F.3d 988, 994 (10th Cir. 1996).  Therefore, Plaintiffs' claim against the City should be dismissed.

25

**V.    CHIEF VELEZ HAD NO PERSONAL PARTICIPATION REGARDING THE SUBJECT INCIDENT, NOR CAN CHIEF VELEZ BE HELD LIABLE BASED UPON RESPONDEAT SUPERIOR.   THEREFORE, CHIEF VELEZ SHOULD BE DISMISSED.**

In claims for relief one and seven, Plaintiffs' allege that Chief Velez was personally responsible for implementing customs, practices and policies, and that Chief Velez failed to properly train and supervise employees.  Complaint, ¶¶26, 53 and 55.  However, Plaintiffs fail to allege any actions by Chief Velez regarding the subject incident.  Therefore, it appears that Plaintiffs are alleging that Chief Velez is liable under a respondeat superior theory.

"Individual liability under §1983 must be based on personal involvement in the alleged constitutional violation."  *Foote v. Spiegel*, 118 F.3d 1416, 1423 (10th Cir. 1997).  Furthermore, "under §1983, 'a defendant may not be held liable under a theory of respondeat superior.'" "Instead, 'a plaintiff must show that an affirmative link exists between the [constitutional] deprivation and either the [defendant's] personal participation, his exercise of control or direction, or his failure to supervise.'"  *Ledbetter v. City of Topeka, Kan.*, 318 F.3d 1183, 1107 (10th Cir. 2003).  *See also Worrell v. Henry*, 219 F.3d 1197, 1214 (10th Cir. 2000).  "A defendant also may not be held liable in a civil rights action merely because of his or her supervisory position."  *Ledbetter v. Board of County Com'rs of the County of Shawnee, Kansas,* 2001 WL 705806, 5 (D.Kan.  "To be liable, a superior must have 'participated or acquiesced in the constitutional deprivation of which complaint is made.'" *Meade v. Grubbs*, 841 F.2d 1512, 1527 (10th Cir. 1988).  *See Jenkins*, 81 F.3d at 995 ("A

26

plaintiff may satisfy this standard by showing the defendant - supervisor personally directed the violation or had knowledge of the violation and acquiesced in the continuance").

Here, although Plaintiffs name Chief Velez as a defendant, and allege that he was responsible for implementing customs, practices and policies, and failed to adequately train employees, nowhere do Plaintiffs' allege any specific actions by Chief Velez in the subject incident. Chief Velez did not personally participate in the subject incident. Furthermore, Chief Velez did not exercise any control, supervision or direction in the incident, nor is such alleged. Since Plaintiffs have failed to show an affirmative link between any alleged constitutional deprivation and Chief Velez, Plaintiffs have failed to state a claim against Chief Velez upon which relief can be granted.

### VI. PLAINTIFFS' CLAIM AGAINST CHIEF VELEZ IN HIS OFFICIAL CAPACITY IS REDUNDANT AND THEREFORE SHOULD BE DISMISSED.

Plaintiffs allege that Chief Velez failed to properly train and supervise employees, and he was responsible for implementing customs, practices and policies. Complaint, ¶¶26, 53 and 55. Plaintiffs are suing Chief Velez in his individual and official capacity. *Id.* at ¶9 and caption. In addition, Plaintiffs are alleging the same claim against the City. *Id.* at ¶25.

"A suit against a **city** official in his **official capacity** is no different from a suit against the **city itself**." *Thompson v. City of Lawrence, Kan.*, 58 F.3d 1511, 1517 (10th Cir. 1995). (Emphasis in opinion). *See also Will v. Michigan Dept. of State Police*, 491 U.S. 58, 109 S.Ct. 2304, 2313, 105 L.Ed.2d 45 (1989). As was held in *Davoll v. Webb*, 943 F.Supp. 1289, 1295 (D.Colo. 1996), *aff'd* 194 F.3d 1116 (10th Cir. 1999):

> A §1983 claim is properly plead against a municipality "either by naming the municipality itself or by naming a municipal official in his or her official capacity". *Stump v. Gates*, 777 F.Supp. 808, 816 n.3 (D.Colo. 1991), *aff'd* 986 F.2d 1429 (10th Cir. 1993). "Naming either is sufficient. Naming both is redundant." *Id.* "[O]fficial capacity suits generally represent only another way of pleading an action against an entity of which the officer is an agent. . ." *Monell*, 436 U.S. 690 n. 55, 98 S.Ct. at 2035 n. 55. "Where a suit contains both entity and official capacity claims, the only defendant is the entity." *Doe v. Douglas County Sch. Dist.*, 775 F.Supp. at 1416.

Since Plaintiffs have also named the City as a defendant, naming Chief Velez in his official capacity is redundant. Therefore, Chief Velez should also be dismissed from the official capacity claim. In addition, the rational which defeats the claim against the City also defeats the claim against Chief Velez. *See Thompson*, 58 F.3d at 1517; *Hinton v. City of Elwood Kan.*, 997 F.2d 774, 783 (10th Cir. 1993).

## VII.   PLAINTIFFS HAVE FAILED TO ALLEGE STATE TORT CLAIMS UPON WHICH RELIEF CAN BE GRANTED. THEREFORE, THE STATE TORT CLAIMS SHOULD BE DISMISSED.

### A.   The Defendants Are Immune From The Tort Claims Pursuant To The Colorado Governmental Immunity Act.

In Plaintiffs' second and fourth claims for relief they allege state tort claims of negligence and intentional infliction of emotional distress. Pursuant to the Colorado Governmental Immunity Act ("CGIA"), Defendants are immune from these claims.

Except in certain limited circumstances, the CGIA provides that a governmental entity, and its employees, are immune from liability in all actions which lie in tort or could lie in tort. *See* §§24-10-105, 24-10-106, 24-10-108, C.R.S. Section 24-10-106 provides the circumstances under which

smw/herring/pldgs/001

immunity is waived.  Nowhere in §24-10-106 is immunity waived for negligence or intentional infliction of emotional distress claims.  Therefore, the CGIA bars these claims as the court lacks subject matter jurisdiction.

**B.      The Officers Conduct Did Not Rise To The Level Necessary To Support An Intentional Infliction Of Emotional Distress Claim, Nor Were Plaintiffs In The Zone Of Danger**.

In Plaintiffs' fourth claim for relief they allege that Herring's children were present in the "zone of danger" at the time of the incident, and that the Officers' conduct caused the children to suffer emotional distress.  Complaint, ¶¶35-38.  It is true that when the Officers arrived at the apartment they did not know if anyone, including the children, were inside the apartment with Herring and in danger.  Exhibit C, ¶¶31-32; Exhibit D, ¶¶34-35.  However, as it turned out, Herring's children were not present in the apartment.  Exhibit C, ¶¶13 and 34.

Claims of outrageous conduct and intentional infliction of emotional distress are simply "two ways of stating the same claim."  *English v. Griffith*, 99 P.3d 90, 93 (Colo.App. 2004).  In Colorado, the elements of outrageous conduct are: (1) the defendant engaged in extreme and outrageous conduct; (2) the defendant engaged in such conduct recklessly or with the intent of causing the plaintiff severe emotional distress; and (3) the defendant's conduct caused plaintiff to suffer emotional distress.  *Culpepper v. Pearl Street Bldg., Inc.*, 877 P.2d 877, 882 (Colo. 1994).  Proof of the tort of outrageous conduct under Colorado law must consist of either an extreme act, both in character and degree, or a pattern of conduct from which the decisive conclusion is that infliction of severe mental suffering was calculated or recklessly or callously inflicted on the plaintiff.  *Gard v. Teletronics Pacing Systems, Inc.*, 859 F.Supp. 1349, 1354 (D.Colo. 1994).

The first element, extreme and outrageous conduct, is satisfied if the conduct goes "'beyond all possible bounds of decency, and [is] regarded as atrocious, and utterly intolerable in a civilized community.'" *Rugg v. McCarty*, 173 Colo. 170, 476 P.2d 753, 756 (1970).  It is the court's responsibility, as an initial matter, to determine whether reasonable persons could differ on the question.  *See Meiter v. Cavanaugh*, 40 Colo.App. 454, 580 P.2d 399, 401 (1978).

In the present case, Plaintiffs offer no evidence to support any conclusion that the Officers' engaged in outrageous conduct.  The facts do not even remotely approach outrageous conduct. Reasonable persons could not conclude that the Officers' conduct was so extreme in degree as to be "atrocious" and "utterly intolerable".  Further, there is no evidence to suggest that the Officers' actions were reckless, nor were they undertaken with the intent to cause severe emotional distress. Therefore, Plaintiffs' intentional infliction of emotional distress claim cannot stand.

In addition, Herring's children were not in the "zone of danger".  "[I]f the plaintiff is not subject to a direct threat of harm or an unreasonable risk of bodily harm, then he is not within the 'zone of danger', and therefore, cannot recover under this claim."  *Atespoyi v. Tandy Corp.*, 51 F.Supp.2d 1120, 1127 (D.Colo. 1999).  *See Card v. Blakeslee*, 937 P.2d 846 (Colo.App. 1996). "Similarly, the Colorado Supreme Court noted, '[w]e have never recognized a cause of action for emotional distress grounded in negligence without proof that the plaintiff sustained a physical injury or was in the "zone of danger."'" *Id*. quoting *Culpepper*, 877 P.2d at 880.  Further, "the United States Supreme Court asserted the 'zone of danger' test limits recovery to plaintiffs who sustain a physical impact resulting from defendant's negligence, or who are placed within immediate risk of physical harm by that conduct." *Atsepoyi*, 51 F.Supp.2d at 1127.  *See Consolidated Rail Corp. v. Gottshall*,

512 U.S. 532, 547, 114 S.Ct. 2396, 129 L.Ed.2d 427 (1994).  Since Herring's children were not in the apartment at the time of the encounter between the Officers and Herring, they were not in the "zone of danger".  Therefore, Plaintiffs' intentional infliction of emotional distress claim cannot stand.

> **C.**     **The Officers' Conduct Did Not Rise To The Level Necessary To Support A Willful And Wanton Claim.**

In Plaintiffs' third claim for relief they allege that the Officers' actions were willful and wanton.  Complaint, ¶32.  However, as with the intentional infliction of emotional distress claim, Plaintiffs offer no evidence to support this claim.

"[I]n order to satisfy the 'willful and wanton' exception to the Colorado Governmental Immunity Act (CGIA) shielding governmental officials from suits in tort, a plaintiff must establish not only the elements of [the underlying] claim. . . but also that the defendant's conduct was done heedlessly and recklessly, without regard to the consequences, or rights and safety of others, particularly plaintiff." *Drake v. City and County of Denver*, 953 F.Supp. 1150, 1160 (D.Colo. 1997), *aff'd,* 161 F.3d 17 (10th Cir. 1998).  Under the undisputed facts of this case, it could not be concluded that the Officers' actions were done heedlessly and recklessly, without regard to the consequences, or rights and safety of others.  The Officers' actions were done in order to help those involved, or who may have been involved.  Therefore, Plaintiffs' willful and wanton conduct claim should be dismissed.

**VIII.   THE OFFICERS' CONDUCT DID NOT RISE TO THE LEVEL
NECESSARY TO SHOCK THE CONSCIENCE.**

In Plaintiffs' tenth claim for relief they claim that the Officers' conduct rose to the level of
conscience shocking behavior so as to create a substantive due process violation.  Complaint, ¶69.
However, as with Plaintiffs' intentional infliction of emotional distress and willful and wanton
claims, under the undisputed facts of this case, the Officers' conduct was not conscience shocking.

"The standard for a substantive due process claim is whether the challenged government
action would 'shock the conscience of federal judges.'" *Tonkovich v. Kansas. Bd. of Regents*, 159
F.3d 504, 528 (10th Cir. 1998) quoting *Uhlrig v. Harder*, 64 F.3d 567, 573 (10th Cir. 1995).  To satisfy
this standard, plaintiff must do more than show that the government actor intentionally or recklessly
caused injury to the plaintiff by abusing or misusing government power.  *Id.* at 574.  "[N]egligently
inflicted harm is categorically beneath the threshold of constitutional due process."  *County of
Scaramento v. Lewis*, 523 U.S. 833, 849, 118 S.Ct. 1708, 140 L.Ed.2d 1043(1998).  Plaintiff must
demonstrate "a degree of outrageousness and a magnitude of potential or actual harm that is truly
conscience shocking." *Uhlrig*, 64 F.3d at 574.  "Conscience shocking behavior generally falls on the
far side of the culpability spectrum, requiring plaintiff to show that the government actor performed
with an intent to harm."  *Richard v. Perkins*, 2005 WL 1391167, 6 (D.Kan.).  "Further, it must be
remembered that the *officer's conduct* must shock the conscience, and not simply the *results* of the
officer's conduct."  *Hayes v. Garcia*, 123 Fed.Appx. 858, 861 (10th Cir. 2005).  (Emphasis in
opinion).

It is clear from the facts that the Officers' intent was not to harm Herring, but rather to help Herring. Even when acting in self-defense the Officers never resorted to deadly force, and always had the goal of restraining Herring so that Herring could be helped. The Officers' conduct does not even remotely approach conscience shocking behavior. Therefore, Plaintiffs' conscience shocking claim should be dismissed.

### IX. THE OFFICERS DID NOT INTEND TO INTERFERE WITH PLAINTIFFS' PERSONAL RELATIONSHIP. THEREFORE, PLAINTIFFS' DEPRIVATION OF FAMILIAL COMPANIONSHIP CLAIM MUST BE DISMISSED.

In Plaintiffs' eighth claim for relief they claim that the Officers' violated their constitutional rights to familial association because of Herring's death. Complaint, ¶61. However, Plaintiffs do not contend that the Officers' intended to interfere with the family relationship, Plaintiffs' merely contend that the relationship was interfered with due to Herring's death.

"[A]n allegation of intent to interfere with a particular relationship protected by the freedom of intimate association is required to state a claim under 1983." *Trujillo v. Board of County Com'rs of Sante Fe County*, 768 F.2d 1186, 1190 (10th Cir. 1985). Such intent is shown by establishing that the defendant or defendants "directed" their challenged conduct or statement at the intimate relationship with knowledge that the statements or conduct will adversely affect that relationship. *J.B. v. Washington County*, 127 F.3d 919, 927 (10th Cir. 1997) citing *Griffith v. Strong*, 983 F.2d 1544, 1548 (10th Cir. 1993). Therefore, to withstand summary judgment Plaintiffs must allege and identify evidence raising an inference of intent to interfere with a particular personal relationship between Plaintiffs and Herring that is protected by the freedom of intimate association. *See Trujillo*,

768 F.2d at 1189-90.  As such, "a Fourteenth Amendment claim based on familial association must be based on specific intent to interfere with that association."  *Hill v. Martinez*, 87 F.Supp.2d 1115, 1119 (D.Colo. 2000).

In the present case, the complaint does not contain any allegation of intent to interfere with a relationship between Plaintiffs and Herring.  Further, Plaintiffs fail to cite any evidence or specific facts with respect to the intent to interfere requirement.  Plaintiffs merely contend that the relationship has been violated because Herring died.  "Plaintiffs therefore do not have standing as a matter of law to assert their personal Section 1983 claims."  *Murphy v. Bitsoih*, 320 F.Supp.2d 1174, 1185 (D.N.M. 2004).  *See Trujillo*, 768 F.2d at 1190 (granting summary judgment against plaintiffs on their Section 1983 claims asserting deprivation of their rights to familial association because the record did not contain evidence of an intent to deprive plaintiffs of their relationship with their son and brother); *Fuentes v. Thomas*, 107 F.Supp.2d 1288, 1296 (D.Kan. 2000) (granting summary judgment against plaintiffs on their Section 1983 claims asserting deprivation of plaintiffs' constitutional rights to familial association with decedent because plaintiffs failed to cite any evidence of intent to interfere).  Not only have Plaintiffs failed to cite any evidence of the Officers' intent to interfere with their relationship, the facts establish that the Officers' intent was to help Herring, not to interfere with any relationship.  Therefore, since Plaintiffs have failed to allege and provide the requisite evidence of intent, Plaintiffs' claim should be dismissed.

smw/herring/pldgs/001

**X.    PLAINTIFFS' PRAYER FOR RELIEF SEEKING EXEMPLARY OR PUNITIVE DAMAGES MUST BE DISMISSED.**

To the extent that Plaintiffs are seeking exemplary damages against the City or Chief Velez in his official capacity, said damage claims must be dismissed.  Exemplary damages may not be recovered against a public entity pursuant to claims based on 42 U.S.C. §1983.  *See City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981).

WHEREFORE, for the foregoing reasons, it is respectfully requested that this Honorable Court enter an order granting Defendants' Motion for Summary Judgment, and dismiss Plaintiffs' complaint with prejudice, and for any other relief this Court deems appropriate.

Dated this 1st day of August, 2005.

Respectfully submitted,

PATRICIA K. KELLY
City Attorney/Chief Legal Officer
Reg. No. 014408


s/Shane M. White
Shane M. White
Senior Attorney
Reg. No.  019034
Colorado Springs City Attorney's Office
30 South Nevada Avenue, Ste. 501
P.O. Box 1575, Mail Code 510
Colorado Springs, Colorado 80901-1575
Telephone:  (719) 385-5909
Facsimile:  (719) 385-5535
E-mail:  swhite@springsgov.com
Attorneys for Defendants

smw/herring/pldgs/001

<u>**CERTIFICATE OF SERVICE (CM/ECF)**</u>

   I hereby certify that on August 1, 2005, I electronically filed the foregoing **Brief In Support Of Motion For Summary Judgment** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

rob@rjflaw.com

and I hereby certify that I have mailed or served the document or paper to the following non CM/ECF participants in the manner (mail, hand-delivery, etc.) indicated by the non-participants name:

        <u>s/Julie A. Zehner</u>
        Julie A. Zehner
        Litigation Specialist
        Colorado Springs City Attorney's Office
        30 South Nevada Avenue, Ste. 501
        P.O. Box 1575, Mail Code 510
        Colorado Springs, Colorado 80901-1575
        Telephone:  (719) 385-5909
        Facsimile:  (719) 385-5535
        jzehner@springsgov.com

smw/herring/pldgs/001