IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 04-cv-02429-PAC-BNB

THE ESTATE OF GREGORY L. HERRING, by and through David Burford, Esq.,
GREGORY L. HERRING, JR., a minor child, by and though his Guardian Ad Litem, David
Burford, Esq.,
SUMMER HERRING, a minor child, by and through her Guardian Ad Litem, David Burford,
Esq., and,
GREGORY Q. HERRING., a minor child, by and through his Guardian Ad Litem, David
Burford, Esq.,

      Plaintiff(s),

v.

THE CITY OF COLORADO SPRINGS, a municipal entity,
GARY DARRESS, individually and in his capacity as a Colorado Springs Police Officer,
RORY CARROLL, individually and in his capacity as a Colorado Springs Police Officer,
and,
BRENT AMBUEHL, individually and in his capacity as a Colorado Springs Police Officer,

      Defendant(s).

---

MEMORANDUM OPINION AND ORDER

---

Patricia A. Coan, United States Magistrate Judge

     This is a §1983 action brought by the Estate of Gregory Herring ("the Estate"). Mr.

Herring was an adult male who died tragically after an altercation with Colorado Springs

police officers in Mr. Herring's apartment. Mr. Herring's minor children, through their

guardian ad litem, are also plaintiffs in this action. All parties have consented to the

jurisdiction of a magistrate judge under 28 U.S.C. §636(c). In the Second Amended

Complaint, filed May 2, 2005, the Estate asserts §1983 claims of excessive force, unlawful

warrantless entry, and deprivation of substantive due process against the three police

officers who were at the scene immediately prior to Mr. Herring's death.[1] The Estate also sues the City for inadequately training its police officers. The minor plaintiffs assert a claim against the defendants for deprivation of their constitutional right of familial association. Plaintiffs seek compensatory and punitive damages.

The matter before the court is Defendants' Motion for Summary Judgment [filed August 1, 2005]. The motion is fully briefed. I heard argument from the parties on November 15, 2005.

I.

The following facts are not disputed, unless otherwise noted. During the afternoon of May 2, 2003, Scott Elder, a resident at the Winfield Apartments in Colorado Springs observed Mr. Herring, an acquaintance who lived in an apartment building across the parking lot from Elder, banging on apartment doors in Mr. Elder's building. (Affidavit of Scott Elder, attached to MSJ,

¶¶1-4) Mr. Herring then began banging violently on Mr. Elder's apartment door. (*Id.* at ¶5) Mr. Elder feared for his safety because Mr. Herring was six feet, two inches tall, and weighed approximately 240 pounds. (*Id.* at ¶¶6-7) Mr. Elder went to his balcony and called 911 to report Mr. Herring's behavior. (*Id.*) While Mr. Elder was on the phone with the 911 operator, he heard a loud crash, looked out his window again, and observed Mr. Herring's three children running from Mr. Herring's apartment screaming. (*Id.* at ¶8) Mr. Elder then heard another crash and saw Mr. Herring, who had returned to his own apartment, throw

---

[1]On November 18, 2005, I dismissed plaintiffs' official and personal capacity claims against Colorado Springs police chief Luis Velez and plaintiffs' state law tort claims, pursuant to the parties' stipulation.

a chair out his window. (*Id.*) Mr. Elder reported these events to the 911 operator and ended the call. (*Id.* at ¶9)

Mr. Herring called 911 again a few minutes later to report that Mr. Herring was breaking the windows in his apartment, was throwing items out the windows, was nude, and that his arms were slashed and bleeding and his abdomen cut. (*Id.* at ¶¶10-12) When police officers arrived in the parking lot shortly thereafter, Elder directed them to Herring's apartment. (*Id.* at ¶¶14-15)

Defendant Colorado Springs police officer Gary Darress was the first police officer to respond. Mr. Darress was advised of the information Mr. Elder relayed to the 911 operator while he was en route to the scene. (Affidavit of Officer Gary Darress, attached to Defendants' MSJ, at ¶¶2-3) Darress was also advised that Herring did not have a weapon. (Deposition of Gary Darress, attached to Plaintiffs' Response, at 71)

Mr. Elder directed Officer Darress to Herring's ground level apartment and told Darress that the children had already left the apartment. (Darress deposition, at 80) Darress approached the front of Mr. Herring's apartment and observed a broken window and numerous household items lying on the ground, including several children's items. (Darress Affidavit, ¶6) Darress then looked inside the broken window and saw items thrown all over the apartment and blood on the walls. (*Id.* at ¶7) Darress heard a grunting or moaning noise coming from someone inside the apartment. (*Id.* at ¶9) Darress did not know at that time whether anyone else was in the apartment with Mr. Herring. (*Id.* at ¶8) Darress then walked around the exterior of the apartment and noticed that every window was broken out and that there was blood throughout the other rooms. (*Id.* at ¶11) When

3

he reached the back of the apartment, he observed Mr. Herring, naked and leaning out the window with his abdomen pressed against the lower broken window frame. (*Id.* at ¶12) Darress also saw cuts on Herring's arms and abdomen. (*Id.* at ¶¶12, 14) Darress suspected that the cuts had been caused by broken glass. (*Id.* at ¶12) Darress introduced himself to Herring as a police officer. (*Id.* at ¶13) Herring continued to throw items out the window. (*Id.*) Herring did not throw any objects at Darress. (Darress Deposition, at 95) Herring also "mumbled or muttered something about war" and expressed concern that Darress was a police officer who might be there to hurt him. (*Id.* at 94) Darress' assessment of the situation was that Mr. Herring might be having a "mental breakdown," was intentionally injuring himself, and was possibly attempting to commit suicide. (Darress Affidavit, ¶14; Darress Deposition, at 87)

Defendant Colorado Springs police officers Carroll and Ambuehl then arrived at the scene separately. (Darress Affidavit, ¶15)   Both had been advised that Herring was creating a disturbance and did not have a weapon. (Affidavit of Officer Rory Carroll, attached to MSJ, ¶3; Affidavit of Officer Brent Ambuehl, attached to MSJ, ¶3; Deposition of Rory Carroll, attached to Plaintiffs' Response, at 111) Carroll observed blood on one or two other apartment doors before responding to Mr. Herring's apartment. (Carroll Affidavit, at ¶5) At Herring's apartment, Carroll and Ambuehl saw officer Darress outside one of several broken apartment windows, telling Mr. Herring to calm down, while Herring threw objects out the window. (Carroll Affidavit, ¶6; Ambuehl Affidavit, ¶7) Carroll observed that Herring had blood on him, but could not determine whether Herring was bleeding, or whether the blood was from someone else. (Carroll Deposition, at 147-148) Although

4

Carroll had been advised by the dispatcher that Herring's children had left the apartment, he was concerned that someone else might be inside with Herring who needed medical attention because of all the blood he observed on Herring and on the doors of other apartments.  (Carroll Affidavit, ¶¶31-32) Ambuehl could see that Herring was naked from the waist up, was bleeding, and had blood all over his body.  (Ambuehl Affidavit, ¶8)  The dispatcher told Ambuehl that children were living with Mr. Herring, but the defendant did not know if any children who might need help immediately were present in the apartment with Herring at that time.  (Ambuehl Affidavit, ¶¶3, 9, 34, 35)

Darress, who was the higher ranking officer, determined that officers Carroll and Ambuehl should enter Herring's apartment while Darress distracted Herring at the broken window. (Darress Affidavit, ¶15; Carroll Deposition, at 141)  Darress hoped that the other officers could subdue Herring to prevent Herring from continuing to hurt himself and to get him some medical attention, and also to prevent Herring from jumping out the window and injuring himself further or injuring someone else.  (*Id.*)  Darress did not believe that there were any children in the apartment based on Elder's and Herring's statements to Darress that the children had left, but he was concerned that someone else, injured and hidden from view, might be inside. (Darress Affidavit, ¶14; Darress Deposition, at 96-97)

Darress instructed Carroll and Ambuehl to kick in the front door after they told him that the door was locked.  (Darress Affidavit, ¶16; Carroll Affidavit, ¶7; Ambuehl Affidavit, ¶10) At that time, Carroll and Ambuehl had been present at the scene less than five minutes. (Carroll Deposition, at 123)  Carroll walked through the apartment to the bedroom where Herring was standing naked, with blood all over his arm and abdomen.  (Carroll

5

Affidavit, ¶10) Carroll also observed blood on the apartment walls.  (*Id.*)  Officer Ambuehl checked the apartment to see if anyone else was inside, but did not find anyone. (Ambuehl Affidavit, ¶13)

When Herring saw Carroll, he "threw a broken shelf and bottle at [him], which missed. (Carroll Affidavit, ¶11; Carroll Deposition, at 150) The officers' accounts about what happened next are somewhat inconsistent.  Carroll stated in his affidavit in support of the summary judgment motion that he sprayed Herring in the face with a single burst of O.C. spray (mace) after Herring began to approach Carroll and ignored Carroll's order to stop.  (Carroll Affidavit, ¶11)  Carroll testified in his deposition, however, that Herring did not approach him until after Carroll sprayed him with a one-second burst of mace.  (Carroll Deposition, at 155-56, 159) Officer Ambuehl testified in his deposition that when he and Carroll entered the apartment, Herring was throwing objects all over the place, and that Carroll sprayed Herring with a one-second burst of O.C. spray at a distance of three to four feet after Herring threw a few objects in Officer's Carroll's direction and took a step towards Carroll.  (Deposition of Brent Ambuehl, at 96-98) Ambuehl stated in his affidavit that Carroll sprayed Herring after Herring ignored Carroll's directive to "calm down and step back." (Ambuehl Affidavit, ¶15)

After Carroll sprayed Herring with the O.C. spray, Herring hesitated for a second, wiped the mace from his face, stated "we are all going to die," and charged at officer Carroll, initiating physical contact.  (Carroll Affidavit, ¶12; Darress Affidavit, ¶18; Ambuehl Affidavit, ¶15)  Herring grabbed Carroll's left shoulder and pushed him back on to the bathroom floor.  (Carroll Affidavit, ¶14) Herring then squeezed Carroll's testicles, causing

Carroll to scream in pain.  (*Id.* at ¶15) Carroll hit Herring with his fist once in the middle of Herring's back while ordering Herring to let go of him, and struck Herring again after Herring refused to comply.  (*Id.*)  Herring then released Carroll and again said "we are all going to die." (*Id.*)  Ambuehl came into the bathroom, grabbed Herring's feet, and ordered him to stop resisting.  (Ambuehl Affidavit, ¶18) Herring was fighting so hard that he was throwing Ambuehl and Carroll around the bathroom.  (*Id.* at ¶19)

In the meantime, Officer Darress entered the apartment and grabbed a blanket with which to subdue Herring and to protect the officers from Herring's blood and other bodily fluids.  (Darress Affidavit, ¶19) Darress found officers Carroll and Ambuehl on the floor inside a small bathroom, attempting to gain control of Herring.  (*Id.* at ¶20) There was water and blood all over the bathroom floor.  (*Id.* at ¶21; Ambuehl Affidavit, ¶17) Herring was face down on the floor with Carroll on his left side in the area of Herring's head and shoulders, and Ambuehl was at Herring's feet.  (Darress Affidavit, ¶22; Carroll Affidavit, ¶16; Ambuehl Affidavit, ¶22)   Darress attempted to wrap the blanket around Herring, but Herring was struggling too much, and the blanket landed in the bathtub.  (Darress Affidavit, ¶23) Carroll struck Herring on the shoulder with his fist in an effort to restrain him.  (Carroll Affidavit, ¶17)

Officer Darress positioned himself on Herring's right side as Herring lay face down, took out his handcuffs and handed them to officer Carroll who was able to get one cuff around Herring's left wrist; however, Carroll could not get the other cuff on because Herring was struggling so hard that he was physically lifting Officers Darress and Carroll off the floor.  (Darress Affidavit, ¶24; Carroll Affidavit, ¶17; Darress Deposition, at 105)

Herring then grabbed Darress' testicles and squeezed hard causing Darress to scream out in pain. (Darress Affidavit, ¶25) Darress hit Herring on the head with the soft side of his fist approximately five or six times before Herring finally let go of him. (*Id.*) Herring then bit officer Carroll's hand. (*Id.* at ¶26; Carroll Affidavit, ¶21) Carroll struck Herring in the side of the face in an effort to get Herring to let go of his hand. (Carroll Affidavit, ¶22; Darress Affidavit, ¶26) While Herring was biting Carroll's hand, Herring also grabbed Darress' baton and pulled it out of its holder. (Darress Affidavit, ¶27) Darress fought Herring to get the baton back. (*Id.*) After Darress secured his baton, Herring continued to fight and Darress struck Herring three or four times on the head using a flat chop (a technique where the officer holds the baton by the short handle and the long extended portion of the baton is parallel to the forearm). (*Id.*) Darress continued to yell at Herring to calm down, but Herring kept fighting. (*Id.* at ¶28) Darress surmised that Herring was high on a mind altering drug. (*Id.*) Herring then bit Darress on his right knee at which time Darress struck Herring in the head with his fist several times, while yelling at Herring to stop biting him. (*Id.* at ¶29)

While the struggle was going on, Officer Carroll thought that Herring was going after his gun because Herring grabbed his firearm holster twice. (Carroll Affidavit, ¶¶18, 24) Carroll tried to pull Herring's left arm behind his back, but Herring pulled Carroll forward. (*Id.* at ¶19) Carroll struck Herring with his fist on Herring's shoulder. (*Id.*) In another attempt to control Herring's arms, Carroll and Ambuehl attempted to place Carroll's baton under Herring's armpit and tried to pull his arm back to restrain him, but that effort failed. (*Id.* at ¶20; Ambuehl Affidavit, ¶23) Carroll then gave his baton to Ambuehl to use under

Herring's legs as a compliance maneuver; when that failed as well, Ambuehl put the baton next to the sink. (*Id.*)

Approximately three minutes after the officers kicked in the door to Herring's apartment, Darress radioed for medical personnel to come in and assist because the police officers had been unable to restrain Herring. (Darress Affidavit, ¶30; Ambuehl Affidavit, ¶¶24-25; Carroll Deposition, at 163) Herring continued to fight and physically lifted Officer Carroll and Darress off the floor. (Darress Affidavit, ¶31) At some point, Darress pressed his thumb into a pressure point on the side of Herring's neck to get him to comply with his commands to calm down, but the maneuver appeared to have no effect. (*Id.*)

Darress was eventually able to handcuff Herring's right wrist, but Herring continued to fight and was able to push himself up, while Darress was on his back, so that Herring was on his forearms with his upper body propped up off the floor. (Darress Affidavit, ¶¶32, 34) Darress felt that if Herring got to his feet, the officers would not be able to contain him, so Darress pushed down on Herring with his arms and upper body in a jumping motion, lying on Herring's back, in an effort to get Herring to lie down on the ground. (*Id.* at ¶35) Carroll also struck Herring in the back twice with his fist and ordered Herring to get down. (Carroll Affidavit, ¶23) Darress again called for medical personnel to come in and assist. (Darress Affidavit, ¶33)

When fire department personnel and the paramedics entered the apartment and proceeded to the bathroom, they observed that Herring was fighting the officers so hard that they could not control him. (Affidavit of Firefighter/Paramedic Clark Gaddie, attached

9

to MSJ, ¶9; Affidavit of Firefighter Lerry Armstead, attached to MSJ, ¶¶6-8). One of the paramedics gave Herring a shot of Haldol in his buttock which appeared to have no effect. (Gaddie Affidavit, ¶¶12-13; Armstead Affidavit, ¶9; Darress Affidavit, ¶36; Carroll Affidavit, ¶25; Ambuehl Affidavit, ¶27) A second shot, this time of Valium, was administered, and Herring slowly began to calm down. (Gaddie Affidavit, ¶14; Armstead Affidavit, ¶10; Darress Affidavit, ¶36; Carroll Affidavit, ¶26; Ambuehl Affidavit, ¶¶28-29) Darress then confirmed to the paramedic that Herring was breathing. (Gaddie Affidavit, ¶16; Darress Affidavit, ¶37) Because Herring had calmed down, the officers left the bathroom and went outside. (Darress Affidavit, ¶38; Carroll Affidavit, ¶27; Ambuehl Affidavit, ¶30) A few minutes later, Herring stopped breathing, but still had a strong carotid pulse. (Gaddie Affidavit, ¶19) After Herring was placed in the ambulance he no longer had a pulse. (*Id.*) He received CPR en route to the hospital where he was pronounced dead. (*Id.*)

The record reflects that the paramedic's administration of one injection of 5 mg of Haldol, followed by an injection of 5 mg of Valium, complied with medical procedure and was one half of the medically authorized dose of each medication. (Deposition of Clark Gadde, attached to Plaintiffs' Response, at 50-54)

The only evidence about the cause of Mr. Herring's death is the report of plaintiffs' expert pathologist who opines that Officer Darress' action in pressing his thumb into the front of Herring's neck caused Herring's trachea to collapse, thereby effectively blocking his airway. (Opinion Letter of Linda E. Norton, M.D, attached to Plaintiffs' Response as Ex.

G, and accompanying Affidavit, filed November 18, 2005[2])  Dr. Norton determined that Herring went into respiratory arrest before the drugs had an opportunity to reach his bloodstream.  (*Id.*)  Dr. Norton's opinion also is based on the fact that Herring did not have a pulse when he was placed into the ambulance and that the cardiac monitor in the ambulance showed "profound bradycardia[3] which became asystole[4] during transport." (*Id.*)

The physical altercation between Herring and the defendant police officers lasted less than thirteen minutes.  (Carroll Deposition, at 163-65; Plaintiffs' Ex. E)

## II.

The purpose of summary judgment is to determine whether trial is necessary.  *White v. York Int'l. Corp.*, 45 F.3d 357, 360 (10th Cir. 1995).   Summary judgment is appropriate under Fed.R.Civ.P. 56(c) when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."   The movant bears the initial burden to "point to those portions of the record that demonstrate an absence of a genuine issue of material fact given the relevant substantive law." *Thomas v. Wichita Coca-Cola Bottling Co.*, 968 F.2d 1022, 1024 (10th Cir. 1992). If this burden is met, the nonmovant must "come forward with specific facts showing that there is a genuine issue for trial as to elements essential to [the nonmovant's claim]."

[2]Dr. Norton states that she reviewed the autopsy report for Mr. Herring in preparing her expert report on the cause of Mr. Herring's death.  (Plaintiffs' Response, Ex. G) The autopsy report has not been provided to the court.

[3]"Bradycardia" is excessive slowness in the action of the heart, usually with a heart rate below sixty beats per minute.  *See* www.online-medical-dictionary.org.

[4]"Asystole" means cessation of the heartbeat. *See id.*

*Martin v. Nannie and the Newborns, Inc.*, 3 F.3d 1410, 1414 (10th Cir. 1993)(internal citations omitted).  The nonmovant has the burden to show that there are genuine issues of material fact to be determined.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The court views the evidence of record and draws all reasonable inferences in the light most favorable to the nonmovant.  *Thomas v. International Business Machines*, 48 F.3d 478, 484 (10th Cir. 1995).  To defeat a properly supported motion for summary judgment, "there must be evidence upon which the jury could reasonably find for the plaintiff."  *Panis v. Mission Hills Bank, N.A.*, 60 F.3d 1486, 1490 (10th Cir. 1995)(quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).  I proceed with caution because only the police officers, who are obviously "interested persons," can testify as to what occurred on that tragic day, while the decedent cannot.

III.

Officers Darress, Carroll and Ambuehl assert the qualified immunity defense in response to plaintiffs' claims against them in their personal capacities

Qualified immunity shields public officials from civil damages liability if their actions did not "violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  When a public official raises the defense of qualified immunity, the plaintiff first must establish that the complained of conduct constitutes a violation of a constitutional or statutory right.  *See Smith v. Cochran*, 339 F.3d 1205, 1211 (10th Cir. 2003)(internal citation omitted).

If the plaintiff points to sufficient evidence to show that the defendant has violated his constitutional right, the defendant is nonetheless entitled to qualified immunity if his

actions were reasonable in light of clearly established law. "A law is "clearly established" for purposes of qualified immunity if there is a Supreme Court or Tenth Circuit decision on point, or if "the clearly established weight of authority from other circuits [has] found the law to be as the plaintiff maintains." *Johnson v. Martin*, 195 F.3d 1208, 1216 (10th Cir. 1999)(quoting *Murrell v. School Dist. No. 1, Denver, Colo.*, 186 F.3d 1238, 1251 (10th Cir. 1999))(internal citation omitted). To satisfy the clearly established law requirement, the plaintiff need not identify a case presenting the exact factual situation at hand; instead, the inquiry focuses on whether the public official reasonably should have known, in light of existing law, that his conduct was unlawful. *Johnson*, 195 F.3d at 1216; *accord Anderson v. Creighton*, 483 U.S. 635, 640 (1987)("The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right"); *Saucier v. Katz*, 533 U.S. 194, 202 (2001) (stating that for the law to be clearly established, it must "be clear to a reasonable officer that his conduct was unlawful in the situation he confronted"); *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)("the salient question . . . is whether the state of the law [at the relevant time] gave [defendants] fair warning that their alleged [conduct] was unconstitutional").

If the plaintiff fails to satisfy either part of the bipartite inquiry, the court must grant the defendant qualified immunity. *Smith*, 339 F.3d at 1211. If the plaintiff establishes that defendant's conduct violated a clearly established right, the burden shifts to the defendant to prove that "there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law." *Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001) (internal quotation omitted).

13

A.   <u>Warrantless Entry</u>

Plaintiff Estate claims that the defendant police officers' warrantless and non consensual entry of Herring's home violated the Fourth Amendment because the officers did not have probable cause to believe that exigent circumstances existed to justify the entry.

A warrantless entry of an individual's home is presumptively unconstitutional unless the government establishes that an exception to the warrant requirement existed at the time of the entry. *See United States v. Anderson,* 154 F.3d 1225, 1233 (10th Cir. 1998). Emergency circumstances may, in appropriate cases, make a warrantless entry constitutional. *Id.* "[A]bsent consent or exigent circumstances, police may not enter a citizen's residence without a warrant." *United States v. Scroger,* 98 F.3d 1256, 1259 (10th Cir.1997).   Police officers may make a warrantless entry if they have a reasonable belief that their own lives or the lives of others are in danger. *Mincey v. Arizona*, 437 U.S. 385, 393 (1978)("[T]he Fourth Amendment does not bar police officers from making warrantless entries and searches when they reasonably believe that a person within is in need of immediate aid.")

The basic elements of the "exigent circumstances" exception are: (1) that law enforcement officers had reasonable grounds to believe that there was an immediate need to protect their lives or others or their property or that of others; (2) the entry was not motivated by an intent to arrest and seize evidence; and, (3) there was a reasonable basis,

approaching probable cause, to associate an emergency with the area or place entered. *United States v. Wicks*, 995 F.2d 964, 970 (10th Cir. 1992)(citing *United States v. Smith*, 797 F.2d 836, 840 (10th Cir. 1986)).

The government bears the burden of proving exigency. *Wicks*, 995 F.2d at 970. The government's burden is "particularly heavy where the police seek to enter a suspect's home." *Roska ex rel. Roska v. Peterson,* 328 F.3d 1230, 1240 (10th Cir. 2003)(quoting *United States v. Anderson*, 981 F.2d 1560, 1567 (other internal quotation and citation omitted)).

In evaluating whether an exigency existed at the time defendants entered Herring's apartment, I examine the circumstances "as they would have appeared to prudent, cautious, and trained officers." *Anderson*, 154 at 1233 (internal citations omitted).

The record shows that Darress, the first officer to arrive at the scene, was told by the dispatcher that Herring initially had been running around banging on apartment doors; that after Herring returned to his own apartment, he began throwing objects through a broken window; that Herring was nude and his arm and abdomen were cut and bleeding; and that Herring's children had run out of the apartment.  Darress was also told that no one had seen Herring with a weapon.  When Darress arrived at Herring's apartment, he walked around the perimeter and observed that every window was broken,  that objects had been thrown all over the apartment, and that there was blood throughout the inside of the apartment.  When Darress reached the room where Herring was standing throwing objects out the window, he did not see Herring with a weapon.  Darress did not believe that there were any children remaining in the apartment based on statements made by Elder,

15

the reporting witness, and by Herring, but he did not know whether anyone else was in the apartment. Darress did not see anyone else in the apartment. Darress also believed that Herring was trying to injure himself and might need immediate medical aid. Based on his concerns, Darress instructed officers Carroll and Ambuehl to kick in the door and enter the apartment. Officers Carroll and Ambuehl were concerned that someone else, including more children, might be in the apartment because of all the blood they saw on Herring, the sidewalk and other apartment doors, along with all of the broken windows.

Under the first element of the exigency analysis, I find that the defendants did not have reasonable grounds to believe that their own lives were in danger before they entered Mr. Herring's apartment. The officers had not received any information that Herring had a weapon, nor did they see Herring with a weapon. Further, although Herring was throwing objects out the window while talking to Officer Darress, he did not throw anything directly at Darress, nor did he threaten Darress or the other officers. Indeed, Darress' confidence in his own safety is evidenced by his deposition testimony that he stood only five feet away from the window during his attempted conversation with Herring. (Darress Deposition, at 92) Accordingly, the warrantless entry was lawful only if defendants had a reasonable belief that someone inside the apartment, including Herring, was in need of immediate aid.[5] Defendants maintain that they had a reasonable basis to believe that Mr. Herring needed immediate medical attention because of the blood they observed on Herring's body and around the apartment, as well as outside the apartment.

---

[5]I note that there is no evidence in the record to suggest, nor do the defendants argue, that the warrantless entry was justified by an immediate need to protect property, such as evidence in a criminal case.

16

Defendants also contend that they had a reasonable belief that someone else (possibly the children's mother), might be inside the apartment who needed aid, because of the blood, the destruction inside the apartment, and the fact that the children ran out of the apartment.

Plaintiff Estate emphasizes that the officers did not have any specific information that Herring had a weapon, that anyone else was inside the apartment, or that Herring had harmed anyone. Plaintiff also argues that it was unreasonable for officers to believe that Herring was seriously injured because he was standing at the window while Officer Darress attempted to converse with him.

Plaintiff Estate maintains that the report of its police policy expert, W. Ken Katsaris, demonstrates the existence of a material factual issue about the legality of defendants' actions. The expert opines:

> The breakdown on proper police procedures began when Darress did not assess that this was a mental health issue and that because there was no threat to Herring or others, that a perimeter be established and communication begun to calm Herring. There was no recognition that _time_ was on the side of the police for a resolution without injury to the officers or Herring. The almost immediate entry, when Herring already voiced fear of the officers, escalated the need for force. Furthermore, Darress did not even think to contact his supervisor for assistance with an assessment. Entry in this incident was improper and exacerbated and accelerated a contact before any of the recognized procedures were implemented. It is well recognized that absent a direct and imminent threat, officers should keep their distance and not be threatening with an emotionally disturbed person.

Plaintiffs' Ex. H, at ¶D.6 (Emphasis in the original). The Estate's expert concludes that defendants acted improperly in entering the home of an individual who appeared to be

emotionally disturbed instead of following "recognized procedures."[6]  The substance of those procedures have not been provided to the court.  Defendant Ambuehl testified in his deposition that during an academy training session prior to May 2003, he received some general written guidelines about interacting with emotionally disturbed persons. (Ambuehl Deposition at 42) The guidelines, as discussed in Officer Ambuehl's deposition,[7] state the following general principles for police officers:

> (1) stay calm and don't overreact;
>
> (2) gather information from family or bystanders;
>
> (3) indicate that you are there to understand and help;
>
> (4) speak simply and briefly and move slowly;
>
> (5) remove distractions, upsetting influences, and disruptive people from the scene;
>
> (6) recognize that the person may be overwhelmed by sensations, thoughts, frightening beliefs, sounds, voices or the environment;
>
> (7) be friendly, patient, accepting and encouraging, but remain firm and professional; and
>
> (8) Be aware that your police uniform, gun, handcuffs, and nightstick may frighten the person.  Reassure the individual that you don't intend harm.

---

[6] I note that, to the extent that plaintiffs' expert's determination that the warrantless entry was "improper" because "there was no threat to Herring or others," Plaintiffs' Ex. H, at ¶D.6, was, in part, an opinion about the existence of exigent circumstances sufficient to justify a warrantless entry, that opinion is inadmissible as an ultimate legal conclusion.  *See Zuchel v. City and County of Denver*, 997 F.2d 730, 742-43 (10th Cir. 1993)(holding that expert may state an opinion on whether conduct at issue fell below accepted standards in the field of law enforcement but may not give an opinion on the constitutionality of the conduct); *Okland Oil Co. v. Conoco Inc.,* 144 F.3d 1308, 1328 (10th Cir.1998)(holding that an expert may not "state legal conclusions drawn by applying the law to the facts."))

[7] The written guidelines have not been provided to the court.

(*Id.* at 43-53)

Even if the defendants did not employ some of the above guidelines or other "recognized procedures" for interacting with the mentally ill, police officers cannot be held liable under §1983 solely on the basis that their conduct does not comport with police policies and procedures.  "Officials sued for constitutional violations do not lose their qualified immunity merely because their conduct violates some statutory or administrative provision." *Davis v. Scherer*, 468 U.S. 183, 194 (1984); *see, also*, *Medina*, 252 F.3d at 1133 (recognizing that claims based on violations of state law and police procedure are not actionable under § 1983)(internal citations omitted).  Thus, even if the preferred course of action would have been, as plaintiff Estate suggests, to continue a non confrontational dialogue with Mr. Herring and to call for someone in the police department who had more specialized training in dealing with the mentally ill instead of making an immediate entry, the reasonableness standard does not require police officers to use "alternative `less intrusive' means." *Illinois v. Lafayette*, 462 U.S. 640, 647-48 (1983); *see, also, United States v. Brown*, 64 F.3d 1083, 1086 (7th Cir. 1995)("The question posed by the fourth amendment is not whether it would have been reasonable to get a warrant, but whether the [entry] itself was reasonable")(citing *United States v. Edwards,* 415 U.S. 800, 807 (1974)).

The reasonableness of defendants' warrantless entry is a close question.  The reporting witness and Herring advised Darress that Herring's children had left the apartment; the officers did not receive any specific information that Herring had been

involved in a physical altercation with another person, or that anyone else was inside the apartment; and, the officers did not observe anyone through the windows.  Moreover, Herring did not make any verbal threats to the police officers; Herring's presentation to Officer Darress was not physically threatening; and,  Herring did not possess a weapon to the officers' knowledge.

A police officer's subjective belief that someone inside might need immediate aid, without more, does not justify a warrantless entry.  *See United States v. Arch*, 7 F.3d 1300, 1304 (7th Cir. 1993); *see*, *also, United States v. Musa*, 401 F.3d 1208, 1217 (10th Cir. 2005) (Henry, J., concurring) (stating that officers' testimony that he was concerned because the police lacked knowledge about the inside of the residence and that the lack of knowledge was potentially dangerous did not establish exigent circumstances sufficient to justify a warrantless entry).

In *Arch*, the Seventh Circuit held that exigent circumstances justified officers' warrantless entry of the defendant's hotel room where the defendant answered the officers' knock on his door with a knife in hand; defendant was behaving in an agitated and bizarre manner; the hotel room was torn apart with furniture overturned; and, the floor was littered with syringes and a bloody rag.  7 F.3d at 1304-05.   The Seventh Circuit reasoned that even though the officers had not received any information that the defendant had injured another person or that another person had been in the hotel room, the officers' observation of the defendant's behavior and the contents of the room "made it reasonable for them to believe that there might be someone else present who needed medical attention."  *Id.* at 1305.

Here, the circumstances supporting a finding of exigency are not as strong as they were in *Arch* because the defendants did not have any information that Mr. Herring was armed, nor did they observe him with a weapon; however, Mr. Herring was a large man and the absence of a weapon does not negate a finding of exigency. For example, in *Keeney v. City of New London*, 196 F.Supp.2d 190 (D.Conn. 2002), the district court upheld police officers' warrantless entry of the unarmed plaintiff's apartment based on the officers' reasonable belief that plaintiff posed a danger to himself or others. The officers had responded to a report that plaintiff was "acting strangely and breaking tree limbs" and during police contact the plaintiff "assumed a fighting stance and rambled incoherently" and then fled from police officers who followed plaintiff to an apartment building. *Id.* at 194-197. The apartment building manager told the officers that the plaintiff had probably stopped taking his medication and let the officers into plaintiff's apartment. *Id.* at 195. Here, although Mr. Herring was in his apartment at the time of the police contact, he had previously been outside banging on other apartment doors where he left traces of blood; he destroyed the contents of his apartment and broke out all the windows; his children ran out of the apartment; Herring was bleeding; and there was blood throughout the apartment which may or may not have belonged to Herring.

Further, although Mr. Herring had not verbalized a threat to commit suicide, he had bleeding lacerations on his arm and abdomen. A cautious and prudent police officer may have reasonably perceived those lacerations as a suicidal gesture in light of Mr. Herring's other bizarre behavior. *Contrast Sepatis v. City and County of San Francisco*, 217 F.Supp.2d 992 (N.D.Cal. 2002)(holding that exigent circumstances did not justify officers'

21

warrantless entry of plaintiff's home on two occasions where neighbors reported bizarre and loud behavior by plaintiff, but did not report that he had a weapon, plaintiff had not threatened the neighbors, police officers did not observe plaintiff with a weapon, officers did not reasonably fear for their safety, and plaintiff had not made any suicidal gestures and demonstrated lucidity when police officers spoke to him).

Upon careful review of the record, I find that even if defendants' belief that someone inside Mr. Herring's apartment, including Mr. Herring, might be in need of immediate aid – based on Herring's behavior in banging on the doors of other apartments, in ransacking the inside of his apartment, in breaking out all of his apartment windows, and in somehow cutting himself on the arm and abdomen, together with the blood on Mr. Herring and throughout the inside of his apartment, the officers' inability to discern whether all of the blood came from Herring, and the fact that Mr. Herring appeared to be emotionally disturbed or on drugs – was not objectively reasonable, the unlawfulness of the warrantless entry was not apparent to the defendants in light of pre-existing law. *Anderson*, 483 U.S. at 640. Stated otherwise, although an individual's right to be free from a warrantless entry into his home absent exigent circumstances is clearly established under *Mincey v. Arizona* and *United States v. Wicks*, existing law did not put a reasonable police officer on notice in May 2003 that the warrantless entry in the circumstances of this case was clearly unlawful. *See Saucier*, 533 U.S. at 206 (recognizing that the qualified immunity doctrine "operates to grant officers immunity for reasonable mistakes as to the

legality of their actions.")  Plaintiffs have not cited any cases to the contrary.[8]  Accordingly, the individual defendants are entitled to qualified immunity on the plaintiff Estate's claim that defendants' warrantless entry of Mr. Herring's apartment violated his Fourth Amendment rights.[9]

      B.    <u>Constitutionality of Officers' Use of Force</u>

The Estate next claims that the defendant officers used unconstitutionally excessive force against Mr. Herring.

In *Graham v. Connor*, 490 U.S. 386, 395 (1989), the Supreme Court held that "all claims that law enforcement officers have used excessive force – deadly or not – in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard."  A "seizure" occurs when an officer's show of authority during a police-citizen encounter succeeds in restraining the citizen.  *See Latta v. Keryte*, 118 F.3d 693, 698 (10th Cir. 1997)(internal

---

[8]Plaintiff relies on *Myers v. Okla. Cnty. Bd. of Cnty. Comm'rs*, 151 F.3d 1313 (10th Cir. 1998); however, that case is factually distinguishable.  In *Myers*, the Tenth Circuit held that police officers' entry into an armed suicidal person's apartment did not unreasonably create the need to use deadly force against that person because the officers had spent hours attempting to resolve the situation through communications with the individual and had ultimately secured a court order authorizing them to take the decedent into protective custody.  151 F.3d at 1320.  The holding in *Myers* cannot be construed to stand for the proposition urged by the plaintiff Estate: that it is unreasonable as a matter of law for police officers to enter the home of an emotionally unstable person without a warrant before attempting to engage in lengthy non confrontational communications with that individual.

[9]Consideration of the second and third factors of the exigency analysis do not compel a different result.  Under the second factor, there is no evidence that the officers' entry was motivated by an intent to arrest and seize evidence.  Once inside the apartment, the officers checked the other rooms to determine that no one else was present, and then proceeded to the room where Herring was located.  (Ambuehl Deposition, at 88-90)  Under the third factor, the same facts which supported defendants' belief that there was an immediate need to protect the lives of others are the same facts they rely on to show that they had a reasonable basis, approaching probable cause, to associate an emergency with the area or place entered.

citation omitted); *see, also, United States v. Harris*, 313 F.3d 1228, 1234 (10th Cir. 2002) ("Ultimately, a seizure requires either the use of physical force by the police officer or submission by the individual to the police officer's assertion of authority")(citing *California v. Hodari D.,* 499 U.S. 621, 626 (1991)). Here, Mr. Herring was seized when the officers used physical force in their efforts to handcuff him after he charged at Officer Carroll, grabbed Carroll's shoulder, and pushed the defendant to the floor, in response to being sprayed with mace. Accordingly, I analyze Mr. Herring's excessive force claim under the Fourth Amendment.

The reasonableness of a particular use of force must be assessed based on the totality of the circumstances, including the severity of the crime at issue, whether the suspect posed an immediate threat to the safety of the officers or others, and whether he was actively resisting arrest or attempting to evade arrest by flight. *Graham*, 490 U.S. at 396. "Because police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation, the reasonableness of the officer's belief as to the appropriate level of force should be judged from that on-scene perspective." *Saucier*, 533 U.S. at 205 (internal citations and quotations omitted).

The court should consider an individual's apparent mental instability as part of the totality of the circumstances in assessing the reasonableness of the force used against that person. *See Champion v. Outlook Nashville, Inc.,* 380 F.3d 893, 904 (6th Cir. 2004)("The diminished capacity of a unarmed detainee must be taken into account when assessing the amount of force exerted"); *Abdullahi v. City of Madison*, 423 F.3d 772, 763

24

(7th Cir. 2005)(recognizing that officers' awareness of decedent's mental disability may be relevant to reasonableness of force used against decedent); *Ludwig v. Anderson*, 54 F.3d 465, 472 (8th Cir. 1995)(concluding that the mental state of an emotionally disturbed person and police guidelines regarding contact with emotionally disturbed persons are relevant in assessing the reasonableness of an officer's use of deadly force); *Deorle v. Rutherford*, 272 F.3d 1272, 1283 (9th Cir. 2001)("[W]here it is or should be apparent to the officers that the individual involved is emotionally disturbed, that is a factor that must be considered in determining . . . the reasonableness of the force employed"); *see, also, Cruz v. City of Laramie, Wyo.*, 239 F.3d 1183, 1188-89 (10th Cir. 2001)(holding that use of hog-tie restraint on person with apparent and discernible diminished mental capacity is unconstitutional). However, "[k]nowledge of a person's disability . . . cannot foreclose officers from protecting themselves . . . when faced with threatening conduct from the disabled individual." *Bates ex rel. Johns v. Chesterfield Cnty., Va.*, 216 F.3d 367, 372 (4th Cir. 2000); *see*, *also*, *Unzueta v. Steele*, 291 F.Supp.2d 1230, 1238 (D.Kan. 2003)(concluding that state hospital staff members' use of non deadly force to restrain a mentally ill patient who hit another staff member hard in the face was not constitutionally excessive).

1.    Whether Defendants Unreasonably Created the Need to Use Force

The plaintiff Estate first argues that the defendants unreasonably and recklessly caused the need to use deadly force against Mr. Herring when they kicked in the door of his apartment within five minutes of their arrival and sprayed him with mace once inside the apartment, causing Herring to physically attack Officer Carroll. Plaintiff argues that

Herring did not threaten any of the officers, or attempt to flee, before he was sprayed with mace and that Herring was outnumbered by police officers three to one.

An officer's conduct before an individual threatens force is relevant to the issue of whether the officer reasonably believed he was in danger at the time he used force, if the officer's conduct was "immediately connected" to the seizure and the threat of force. *Bella v. Chamberlain*, 24 F.3d 1251, 1256 n.7 (10th Cir. 1994)("Obviously, events immediately connected with the actual seizure are taken into account in determining whether the seizure is reasonable"); *Sevier v. City of Lawrence, KS*, 60 F.3d 695, 699 (10th Cir. 1995)(stating that the reasonableness of the defendants' use of force "depends both on whether the officers were in danger at the precise moment that they used force and on whether Defendants' own reckless or deliberate conduct during the seizure unreasonably created the need to use such force"); *Allen v. City of Muskogee*, 119 F.3d 837, 840 (10th Cir. 1997)(citing *Sevier*).

I have concluded that the individual defendants are immunized from liability on the plaintiff Estate's claim that their warrantless entry of Mr. Herring's apartment violated Mr. Herring's Fourth Amendment rights. Accordingly, I limit my analysis of the reasonableness of defendants' pre-seizure conduct to Officer Carroll's use of pepper spray against the decedent after entering Herring's apartment.

The record shows that after Officers Carroll and Ambuehl entered Mr. Herring's apartment, at Officer Darress' instruction, and that Carroll walked to the back bedroom where Herring had been standing at the window throwing objects outside. It is undisputed that Herring looked at Carroll and threw a broken shelf and a bottle at Carroll. Because

the officers' testimony about whether Herring also took a step towards Carroll, and whether Carroll ordered him to "stop" or "step back" is inconsistent, I construe the evidence in plaintiffs' favor and assume that Herring did not move towards Carroll, and that Carroll did not order Herring to stop, before Carroll deployed a single burst of OC spray against him. (Carroll Deposition, at 155-56) After Herring was sprayed, he stated "we are all going to die," and charged at Carroll, knocking him to the ground.  The physical brawl which resulted in Mr. Herring's death ensued.

A police officer's use of pepper spray is objectively reasonable force where the recipient is resisting arrest, refusing to comply with police requests, or acting in a threatening or violent manner.  *See Vinyard v. Wilson*, 311 F.3d 1340, 1348 n.12 (11th Cir. 2002)(collecting cases).  In contrast, courts have concluded that using pepper spray is constitutionally excessive in cases where the individual is not ignoring police commands or instructions, is not acting in a threatening or violent manner, or when the arrestee surrenders or is secured, and has been rendered helpless.  *Id.* n. 11 (collecting cases).

Plaintiff Estate relies on the opinion of its police procedures expert that defendants "had no knowledge of the research on the use of OC against the mentally ill, and the application in this incident escalated the need for force." (Plaintiff's Ex. H, at ¶D.5) However, the expert's opinion does not discuss any research studies or other pertinent authorities which have concluded that the use of OC spray is contra indicated for the mentally ill because it is likely to provoke a violent response.  Moreover, although Carroll testified in his deposition that he recognized that Mr. Herring might be mentally ill based on his observations of Herring after he was inside the apartment, but before he deployed

27

the mace,[10] Carroll also testified that he had not received any training cautioning or prohibiting the use of mace against persons who appear to be mentally ill.[11]   (Carroll Deposition, at 121)  Carroll further testified that he was trained generally to use OC spray as a method to calm down an agitated or excited individual so that the individual could be taken into custody without further incident.  (Carroll Deposition, at 154)

There is no evidence in the record that the defendants failed to comply with any Colorado Springs Police Department procedures regarding the use of mace generally. *See Nelson v. County of Wright*, 162 F.3d 986, 991 (10th Cir. 1998)(recognizing that it may be appropriate for district court to consider whether the defendants complied with standard police procedures in analyzing an excessive force claim).

The material facts supporting plaintiff's excessive force claim are undisputed, except for Officer Carroll's internally inconsistent testimony relating to his deployment of mace against Mr. Herring.  I have resolved that inconsistency in Mr. Herring's favor, as I am required to do when considering a motion for summary judgment.  *See Thomas*, 48 F.3d at 484.  I thus decide as a matter of law whether the officers' actions were objectively reasonable.  *See Medina*, 252 F.3d at 1131.

---

[10]Carroll did not have any contact with Herring before the forcible entry which occurred only five minutes after Carroll and Ambuehl arrived at the scene. (Carroll Deposition, at 134) Carroll testified in his deposition that he did not perceive that Mr. Herring might be mentally ill until he was inside the apartment and heard Herring make some irrational comments about "God" and that they were all "going to die." (*Id.* at 161-62)

[11]Defendants Darress and Ambuehl also testified in their depositions that they had not been trained about possible negative effects associated with the use of mace on the mentally ill at the time of the incident. (Darress Deposition, at 63; Ambuehl Deposition at 20-25)

I find that the objective reasonableness of Officer Carroll's use of pepper spray against Mr. Herring is a close question. The defendants did not enter Herring's apartment to arrest him, but rather for the stated purpose of "subduing" him[12] so that they could get him medical attention. After a cursory search of the apartment which revealed that no one else was inside, defendants had no reasonable basis to believe that Mr. Herring had harmed another person or committed a crime, and the evidence construed in plaintiff's favor shows that Herring did not disobey any instructions or orders from the defendants before the mace was deployed against him. However, Mr. Herring did act aggressively toward Officer Carroll by throwing objects at the defendant, including a broken shelf. Although the objects did not actually hit Carroll, Mr. Herring had demonstrated threatening and violent behavior immediately before the officers' arrival in ransacking and breaking out all the windows in his apartment, and in engaging in unknown actions which resulted in two lacerations and blood on Herring's body as well as blood smeared on walls throughout the apartment.

The facts in *Riggs v. City of Pearland*, 177 F.R.D. 395 (S.D.Tex. 1997) are somewhat similar. There, the district court held that police officers' use of mace against an unarmed plaintiff was constitutional where officers responded to a 911 call of a possible

---

[12]Officer Darress stated in his affidavit in support of the summary judgment motion that he ordered Officers Carroll and Ambuehl to enter Herring's apartment so that they could "subdue Mr. Herring so that we could prevent Mr. Herring from continuing to hurt himself, get Mr. Herring medical attention, and prevent Mr. Herring from jumping out the broken window and either injuring himself further or becoming a threat to others." (Darress Affidavit, at ¶15) However, Darress did not convey his plan to the other officers. Officer Carroll testified that he did not have any conversation with Darress before entering the apartment, other than regarding the entry itself. (Carroll Deposition, at 134-139) Officer Ambuehl testified that Officer Darress did not explain to Ambuehl the basis for Darress' decision that they should enter the apartment. (Ambuehl Deposition, at 87) Accordingly, it is not clear what Carroll and Ambuehl intended to do with Herring once they were inside his apartment and after they had determined that no one else was present.

disturbance at the plaintiff's apartment, officers observed through the window that the plaintiff was throwing himself around the room in his underwear and had a laceration on the right side of his head, officers entered the apartment and attempted to subdue the plaintiff, and officers sprayed the plaintiff with mace after plaintiff "crawled rapidly" towards the officers. *Id.* at 408.

Moreover, the single, one-second burst of spray, from a distance of three to four feet, appeared to have no effect on Mr. Herring and there is no medical evidence to the contrary. Although the lack of a physical injury does not preclude an excessive force claim, *see Holland ex rel. Overdorff v. Harrington*, 268 F.3d 1179, 1195 (10th Cir. 2001), it is one factor for the court to consider in the totality of the circumstances analysis. *See Nelson*, 162 F.3d at 990 (internal citation omitted).

I find and conclude that to the extent that Carroll's use of mace against Mr. Herring implicates the Fourth Amendment,[13] the individual defendants are entitled to qualified immunity on the plaintiff Estate's claim that the use of mace constituted unlawful excessive force. Even if it was not objectively reasonable for Officer Carroll to perceive Herring's actions in throwing a broken shelf and bottle at him as a threat to the defendant's safety so that the use of pepper spray was unconstitutionally excessive, the unlawfulness of Officer Carroll's conduct was not apparent in light of existing law. An individual's Fourth

---

[13]If the OC spray was deployed as part of the defendants' efforts to effect a seizure of the decedent, the officer's use of force is analyzed under the Fourth Amendment. *See Graham*, 490 U.S. at 395. As discussed in note 12, *supra*, it is unclear whether Officer Carroll intended to effect a seizure of Mr. Herring when he entered the apartment. The plaintiff Estate has also raised its excessive force allegations in the context of a substantive due process claim. Accordingly, in the event that the deployment of mace was conduct unrelated to defendants' efforts to seize Mr. Herring, I analyze it separately under the Fourteenth Amendment Substantive Due Process Clause in Section III.D., *supra*.

Amendment right to be free from excessive force was clearly established in *Graham;*
however, the contours of that right were not sufficiently clear that a reasonable police
officer would know that using mace against Mr. Herring under the circumstances Officer
Carroll confronted violated that right. Likewise, there is no clearly established law holding
that the use of mace on persons who appear to be mentally unstable is *per se* excessive
force.

Because defendants are immune from liability on the plaintiff Estate's claim that
Officer Carroll used excessive force against Mr. Herring when he deployed a single burst
of mace against Mr. Herring, I cannot consider the use of mace as conduct that
unreasonably created the need to use force against the plaintiff in the physical struggle
between Herring and the defendants that followed. Accordingly, the three Tenth Circuit
cases upon which plaintiff primarily relies in support of his claim are inapposite.[14]

---

[14]In *Sevier* and *Allen*, the Tenth Circuit held that summary judgment was inappropriate on the plaintiffs' excessive force claims where police officers responded to 911 calls reporting <u>armed</u> and possibly suicidal individuals, the officers immediately confronted the armed suicidal persons without considering other non-confrontational options, and the confrontations ultimately resulted in the police shooting deaths of the individuals. *Sevier*, 60 F.3d at 698-699; *Allen*, 119 F.3d at 839-841. In both cases, the Tenth Circuit held that if the plaintiff's version of the facts was believed, the officers' conduct could be construed by the jury as reckless or deliberate conduct that unreasonably created the need for the officers to use deadly force. *Sevier*, 60 F.3d at 701 n.10; *Allen*, 119 F.3d at 841.

Plaintiff relies on *Myers* to show how police officers should act in encounters with the mentally ill. In *Myers*, the Tenth Circuit held that police officers' entry into an <u>armed</u> suicidal person's apartment did not unreasonably create the need to use deadly force against that person because the officers had spent hours attempting to resolve the situation through communications with the individual and had ultimately secured a court order authorizing them to take the decedent into protective custody. 151 F.3d at 1320.

As discussed in the text above, the individual defendants cannot be held personally liable for unreasonably creating the need for the officers to use deadly force against Mr. Herring based on their actions in entering his apartment without a warrant and in spraying him with mace because I have concluded that defendants are entitled to qualified immunity**.** However, even if I did consider the merits of the plaintiff Estate's claim that the warrantless entry and use of mace unreasonably created the need to use physical force against the decedent, I note that the evidence does not show that the defendants acted recklessly. Unlike the factual circumstances in *Sevier, Allen,* and *Myers*, Mr. Herring was not armed with a deadly weapon. A reasonable jury could not conclude from the evidence of record that the

2.    <u>Defendants' Use of Physical Force</u>

The plaintiff Estate next argues that defendants' use of deadly force against Mr. Herring in their efforts to restrain him after spraying him with mace was unreasonable. Plaintiff emphasizes that Herring was lying face down on the floor with officers on top of him when Officer Darress exerted the force against Herring that allegedly caused Herring's death.

Defendants do not rebut the report of plaintiffs' expert pathologist, Linda Norton, M.D., P.A. Dr. Norton opines that Mr. Herring's death was caused by Officer's Darress' application of pressure to Mr. Herring's neck, causing his trachea to collapse and thereby blocking his airway.  Defendants argue, however, that "[t]he Officers at no time resorted to deadly force." (Brief in Support of Motion for Summary Judgment, at 24)

The Tenth Circuit has adopted the Model Penal Code's definition of "deadly force." *See Jiron v. City of Lakewood*, 392 F.3d 410, 415 n.2 (10th Cir. 2004)(citing *Ryder v. City of Topeka*, 814 F.2d 1412, 1416 n. 11 (10th Cir.1987)). The Model Penal Code defines "deadly force" as: "force that the actor uses with the purpose of causing or that he knows to create a substantial risk of causing death or serious bodily harm."  Model Penal Code § 3.11(2) (1985).

---

officers acted with a reckless disregard for Mr. Herring's or their own safety when they entered his apartment and sprayed him with mace.  There is no evidence in the record that the defendants had any knowledge that the use of mace against an unarmed mentally ill person is likely to result in a potentially deadly physical confrontation, and such a risk is not patently obvious. The Tenth Circuit has made clear that "in order to constitute excessive force, the conduct arguably creating the need for force must be immediately connected with the seizure and must rise to the level of recklessness, rather than negligence."  *Medina*, 252 F.3d at 1132.

There is no evidence that Darress applied pressure to Herring's neck for the purpose of causing Herring's death; however, Darress testified in his deposition that he knows that contact with a suspect's neck can cause severe injury or even death and may constitute deadly force in certain situations.   (Darress Deposition, at 63)   I find that Darress's application of pressure to Herring's neck created a substantial risk of causing death or serious bodily harm and therefore constituted the use of deadly force.

A police officer may use deadly force against an individual if the officer has probable cause to believe that the individual poses a threat of serious physical harm either to the officer or to others.  *Tennessee v. Garner*, 471 U.S. 1, 11 (1985); *Sevier,* 60 F.3d at 699 (citing *Garner*); *Carr v. Castle*, 337 F.3d 1221, 1227 (10th Cir. 2003).

An individual may pose a threat of serious physical harm to police officers even if he does not possess a firearm, knife, or other deadly weapon.  In *Ryder*, the Tenth Circuit held:

> Certainly, whether a suspect is armed is a relevant factor in determining whether the suspect poses an immediate danger. A per se rule, however, that a police officer may never employ deadly force unless attacked by a suspect possessing a deadly weapon would place a police officer in a dangerous and unreasonable situation. Therefore, we conclude that whether a particular seizure is reasonable is dependent on the "totality of the circumstances," [internal citation omitted], and not simply on whether the suspect was actually armed. [internal citation omitted].

814 F.2d at 1419 n.16; *see, also, Nelson*, 162 F.3d at 990-91 (concluding that officer's use of deadly force against unarmed suicidal person was not constitutionally excessive where individual resisted officer's efforts to handcuff him and during ensuing struggle,

reached for the officer's gun, hit and kicked the officer repeatedly, and shoved officer

onto the floor into a closet).

The evidence shows that during the physical struggle leading up to Officer

Darress' application of pressure to Mr. Herring's neck, Herring pulled Officer Darress'

baton out of its holster during the struggle and also grabbed Officer Carroll's firearm

holster twice, which caused Carroll to believe that Herring was going for his gun.

Herring also squeezed the testicles of two officers during the fight and bit two officers-

one on the hand and one on the leg.  The officers responded to Herring's actions by

hitting him in the head and body with their fists and using one of their batons in a flat

chop maneuver.  The officers also tried unsuccessfully to restrain Herring's arms and

legs with the baton.  After Officer Darress called for medical assistance to help subdue

Herring, Herring continued to fight and lifted Officers Carroll and Darress, who were

positioned on either side of Herring (and who must have been partially lying on the

decedent), up off the floor.  Knowing that the maneuver was deadly force, Officer

Darress pressed his thumb into a pressure point on the side of Herring's neck to get

Herring to stop fighting them.  Darress believed that the pressure application had no

effect because Herring continued to struggle.  Darress was finally able to handcuff both

of Herring's hands in front of him and again called for medical personnel to assist them.

Herring then pushed himself off the floor onto his forearms while Darress was on his

back.  Darress, believing that he and the other officers would not be able to contain

Herring if he was able to get to his feet, pushed Herring back down to the floor, using

his arms and upper body in a "jumping motion."  At that point, the paramedics came into

the apartment and administered medication to Herring.  Herring slowly began to calm

down and the defendants exited the apartment while the paramedics attended to Mr.

Herring.

An officer's use of deadly force is reasonable where the person seized makes an

attempt to get the officer's gun.  *See Blossom v. Yarbrough*, 429 F.3d 963, 968 (10th

Cir. 2005); *Nelson*, 162 F.3d at 990-91.  Here, there is no evidence that Officer Darress

knew that Mr. Herring had twice attempted to grab Officer Carroll's gun when Darress

applied deadly force to Herring.  Moreover, although Herring was able to grab  Darress'

baton, Darress regained control of the baton before Herring was able to use it to inflict

any injury.  Further, Herring was outnumbered by police officers three to one, was not

suspected of committing any crime, and was not armed.  Although Mr. Herring was wet

and naked and was demonstrating superior strength so that the defendants were

having difficulty subduing him, the evidence does not establish as a matter of law that

Herring's actions in biting and squeezing the testicles of the officers, and in grabbing

Officer Darress' baton, gave Officer Darress probable cause to believe that Herring

posed a threat of serious physical harm to the officers sufficient to justify the use of

deadly force against him.  On this record, therefore, I cannot conclude that Officer

Darress' use of deadly force was objectively reasonable under the Fourth Amendment,

nor can I conclude that defendant Darress is entitled to qualified immunity because the

law was clearly established in *Tennessee v. Garner*, *Graham* and *Sevier* that a police

officer may not use deadly force against an individual unless the officer has probable

cause to believe that the individual poses a threat of serious physical harm either to the

35

officer or to others.  The contours of Mr. Herring's right to be free from police use of deadly force were sufficiently clear that a reasonable police officer in the circumstances confronted by Darress, who knew that application of pressure to an individual's neck could result in death, would have known that his conduct was unlawful.  Stated otherwise, defendant Darress did not make a reasonable mistake as to what the law requires because the circumstances "do not disclose substantial grounds for [Darress] to have concluded he had legitimate justification under the law for acting as he did." *Harrington*, 268 F.3d at 1197 (citing and quoting *Saucier*, 533 U.S. at 207-08). Defendants' motion for summary judgment on the excessive force claim is denied as to defendant Darress.

I grant summary judgment in favor of defendants Carroll and Ambuehl on the Plaintiff Estate's excessive force claim, however.  Officer Ambuehl's use of force was limited to attempts to restrain Herring's legs with his hands and baton.  Officer Carroll's actions in hitting Herring on the back and shoulder in response to Herring's actions in squeezing his testicles, in biting him and in using his baton to attempt to restrain Herring's arms were objectively reasonable under the circumstances. There is no evidence that any of the force used by Carroll or Ambuehl was a cause of Mr. Herring's death.

C.    Constitutional Claim against City for Failure to Train

Plaintiff Estate sues the City of Colorado Springs under §1983 for not adequately training its police officers in appropriate methods of interacting with

mentally ill individuals,[15] including the use of force, restraint, and chemical sprays as applied to mentally ill individuals.  Plaintiff does not allege any deficiency in the City's officer training on the use of force regarding persons who are not mentally ill.

A municipality or other local government cannot be held liable under §1983 unless a municipal policy or custom was the "moving force" behind a constitutional violation.  *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 404 (1997); *Monell v. Dep't of Social Services*, 436 U.S. 658, 694 (1978).  Inadequate police training can be the basis of §1983 liability only if the failure to train amounts to deliberate indifference to the constitutional or statutory rights of persons with whom the police come into contact. *City of Canton v. Harris*, 489 U.S. 378, 388 (1989); *Brown*, 520 U.S. at 411.  Even if inadequate training is demonstrated, the lack of proper training must actually cause the plaintiff's injury to be actionable under §1983.  *City of Canton*, 489 U.S. at 391.

To establish municipal liability under §1983 for inadequate training of police officers, a plaintiff must show that officer training was in fact inadequate and then satisfy the following requirements: (1) the officers violated the Constitution; (2) the constitutional violation arose under circumstances that constitute a usual and recurring situation with which police officers must deal; (3) the inadequate training demonstrates a deliberate indifference on the part of the city toward persons with whom the police officers come into contact; and (4) there is a direct causal link between the

---

[15]Although there is no evidence in the record that Mr. Herring had a history of mental illness, after they responded to his apartment, defendants recognized that Mr. Herring was acting in a manner consistent with that of a mentally ill person.  (Darress Deposition, at 87-88; Carroll Deposition, at 161-62).

constitutional deprivation and the inadequate training. *Allen*, 119 F.3d at 841 (internal citation omitted); *Carr*, 337 F.3d at 1228. "Evidence of a single violation of federal rights, accompanied by a showing that a municipality has failed to train its employees to handle recurring situations presenting an obvious potential for such a violation, is sufficient to trigger municipal liability." *Allen*, 119 F.3d at 842 (internal citation omitted).

I initially find that the Plaintiff Estate has met its burden on summary judgment to demonstrate the existence of material factual issues about the adequacy of the training defendants received with respect to police interactions with the mentally ill. The record reflects that defendants received some training in dealing with mentally ill persons; however, none of the defendants had any specific recollection of the content of that training. (Darress Deposition, at 22-26; Carroll Deposition, at 33; Ambuehl Deposition, at 20-22)  Chief Velez testified that, at the time of Mr. Herring's death, the Colorado Springs Police Department had written policies and procedures relating to officer interaction with the mentally ill, but he too could not recall the content of those policies. (Deposition of Colorado Springs Police Chief Luis Velez, at 135) The court's record does not contain any written policies or procedures directed to police officer contact with individuals who appear to be mentally disturbed. The only evidence about the content of the City's policies is in Officer Ambuehl's deposition testimony, discussed in Section III.A., *supra*, about some written guidelines he received in police academy training.

Moving on to the other requirements for municipal liability, I will assume, under the first factor, that defendants violated Mr. Herring's Fourth Amendment rights when

they entered his apartment without a warrant and sprayed him with mace based on my

conclusions in Sections III.A. and III.B.1, *supra*, that the defendants are entitled to

qualified immunity under the clearly established law prong of the inquiry, even if their

conduct violated the Constitution.[16]   In addition, genuine issues of material fact remain

about whether defendant Darress' application of pressure to Mr. Herring's neck was

lawful under the Fourth Amendment.

Plaintiff Estate also has satisfied its burden on summary judgment under the

second factor because the evidence shows that it is common for Colorado Springs

police officers to have encounters with mentally ill or emotionally disturbed people.

(Velez Deposition, at 66-67; Darress Deposition, 29; Carroll Deposition, at 25).

The third and fourth factors are a closer question.   A plaintiff may establish the

deliberate indifference element of a municipal policy in accordance with the Supreme

Court's following reasoning in *Canton*.

> It may seem contrary to common sense to assert that a municipality will
> actually have a policy of not taking reasonable steps to train its
> employees.  But it may happen that in light of the duties assigned to
> specific officers or employees the need for more or different training is so
> obvious, and the inadequacy so likely to result in the violation of
> constitutional rights, that the policymakers of the city can reasonably be
> said to have been deliberately indifferent to the need.  In that event, the
> failure to provide proper training may fairly be said to represent a policy

---

[16]Generally, a City cannot be held liable where there is no underlying constitutional violation by one of its officers or employees. *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986); *Myers*, 151 F.3d at  1317 (recognizing that plaintiffs' failure to train claims against the City required a predicate showing that the officers used excessive force against the plaintiff).  An exception arises, however, when the court or jury finds that even if the officer committed a constitutional violation, he is nonetheless entitled to qualified immunity because his conduct did not violate clearly established law.   *Myers*, 151 F.3d at 1317.  In such cases, the claim against the City can proceed because municipalities do not enjoy the same immunity from liability. *Id.*

for which the city is responsible, and for which the city may be held liable if it actually causes injury.

*Canton*, 489 U.S. at 390. In *Brown*, the Supreme Court further explained its holding in

*Canton:*

> [I]n a narrow range of circumstances, a violation of federal rights may be a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations. The likelihood that the situation will recur and the predictability that an officer lacking specific tools to handle the situation will violate citizens' rights could justify a finding that policymakers' decision not to train the officer reflected `deliberate indifference' to the obvious consequences of the policymakers' choice – namely, a violation of a specific constitutional or statutory right.

*Brown*, 520 U.S. at 409.

It is not enough to show "that an injury or accident could have been avoided if an officer had better or more training, sufficient to avoid the particular injury-causing conduct." *See Canton*, 489 U.S. at 391. Instead, the plaintiff's evidence must demonstrate that the lack of adequate training reflects deliberate indifference to the risk that a violation of a particular constitutional or statutory right will follow the decision not to train. *Brown*, 520 U.S. at 411.

Plaintiff Estate relies heavily on its police policies expert who opines:

> Darress, along with Officers Carroll and Ambuehl, did not activate to respond to Herring's condition or activity in <u>any</u> manner consistent with the police recognized standard of care for either recognizing, approaching, responding to or communicating with a mentally ill or emotionally disturbed person – especially one situated like Herring, who was in his apartment, alone, and not threatening anyone while experiencing this episode.

40

> While the officers later acknowledge in their depositions that they accept there are factors that were exhibited by Herring that would have led to the conclusion he was mentally ill, and that there are practices that suggest a proper response, there was not a hint of their implementing this response. Likely, the reason was a lack of training provided by the CSPD for contact with this special population.  Admittedly, there was some training in their basic training program on the police response to the mentally ill, [sic] the time spent and amount of training fell far short of the recognized standard of care for digesting the basics of response to the emotionally disturbed.  The training was of such a minuscule amount for such a <u>likely</u> encounter by a police officers that the amount of training simply reached a level of deliberate indifference because of the significance of the potential contact with people who are mentally ill, and emotionally disturbed.  The officers indicated that hundreds of such contacts have been made with this special population by the CSPD in the last five years.  Such a core responsibility must be met with a concomitant training curriculum so that officers will immediately recognize, approach, and contact the mentally ill within guidelines that are tried and proven for high success of a resolution without death or serious injury – an outcome that differed 180 degrees from this incident.

(Plaintiffs' Ex. H, Katsaris Affidavit, at ¶¶D.3, 4)  Plaintiffs' expert then opines that if the defendants had been properly trained to recognize the Herring situation as one potentially involving a mental health issue, they would have established a perimeter around Mr. Herring's apartment, called a supervisor for assistance with assessment, and communicated with Herring for as long as necessary to try to calm him down, instead of immediately breaking in the door of Herring's apartment which caused Herring to feel threatened, and then spraying him with mace, which escalated the need for force.  *Id.* at ¶¶D.5, 6.

The Tenth Circuit's most recent pronouncements on what evidence a plaintiff

41

must produce to satisfy the third and fourth elements for municipal liability under §1983 are set forth in *Allen*, *Brown v. Gray*, 227 F.3d 1278 (10th Cir. 2000)*, Carr v. Castle*, and *Olsen v. Layton Hills Mall*, 312 F.3d 1304 (10th Cir. 2002).

In *Allen v. Muskogee, Okla.,* the Tenth Circuit reversed the district court's order granting summary judgment to police officers and the municipality in an excessive force case. The court first concluded that a police officer may have recklessly and unreasonably created the need to use deadly force against an armed and suicidal individual based on evidence that the officer ran up to the individual's truck, shouted at him to get out, and attempted to seize the individual's gun, and the individual responded by pointing his gun at police officers, causing the officers to shoot him dead. 119 F.3d at 839, 841. The Tenth Circuit also reversed the grant of summary judgment in favor of the municipality on the plaintiff's failure to train claim. The court concluded that the municipality had demonstrated deliberate indifference to the rights of persons with whom the police come in contact by affirmatively training its police officers to leave cover and approach armed suicidal persons to try to disarm them, where the plaintiff's expert testified at length that such training was contrary to all authorities on police tactics and procedures who were in agreement that it is inappropriate to leave cover and approach a suicidal and armed individual person to attempt to take a gun away. *Id.* at 842-43. The court stated:

> When viewed in light most favorable to the plaintiff, the record contains evidence that the officers were trained to act recklessly in a manner that created a high risk of death. The evidence is sufficient to support an inference that the need for different training was so obvious and the

42

>       inadequacy so likely to result in violation of constitutional
>       rights that the policymakers of the City could reasonably be
>       said to have been deliberately indifferent to the need.

*Id.* at 844. The court in *Allen*, also held, under the fourth factor, that there was a direct

causal link between the affirmative training the officers received and the constitutional

violation based on expert evidence that approaching an armed, emotionally disturbed

person and trying to get his gun recklessly created a high risk of death for officers, the

armed individual and other civilians.  *Id.* at 844.

Unlike the circumstances in *Allen*, there is no evidence here that the City

actually trained its police officers to act in a manner contrary to recognized police

procedures when interacting with the mentally ill, nor is there any evidence that

defendants were trained to effect warrantless entries of individual's homes in the

absence of exigent circumstances,[17] or to use objectively unreasonable force against

persons with whom they come in contact.  The only evidence on this point is Carroll's

testimony that he was trained to use mace as a method of subduing an aggressive

person and that he did not receive training specifically about the use of mace on

someone exhibiting signs of mental illness.  However, there is no evidence that the City

made a conscious decision to instruct officers to use mace on the mentally ill.  Instead,

the City  failed to caution officers about the potential adverse effects of mace on the

mentally ill.  And, although plaintiff's expert states that defendants ignored the research

---

[17]Chief of Police Velez testified that police officers are trained to enter an individual's home without a warrant only when exigent circumstances are present.  (Velez Deposition, at 119-20)

on the use of mace with mentally ill people, he does not opine that the use of mace presents serious safety risks.

In *Brown v. Gray*, 227 F.3d 1278 (10th Cir. 2000), the Tenth Circuit affirmed the district court's denial of summary judgment on the plaintiff's failure to train claim against the City and County of Denver based on an incident when an off-duty police officer pulled over a motorist after they became involved in a traffic dispute. *Id.* at 1284. According to the plaintiff, the officer approached the plaintiff's vehicle and pointed his gun in plaintiff's face; plaintiff responded by putting his hands up and stating "what the hell do you want?  I don't have a damn thing;" and then plaintiff put his vehicle into gear and started to drive away, at which point the officer fired several shots into the car, badly injuring the plaintiff. *Id.*  Plaintiff claimed that Denver's training with respect to its always armed/always on duty policy was inadequate. *Id.* at 1286.  The Tenth Circuit agreed, holding that the City's policy was inadequate and that the inadequacy demonstrated Denver's deliberate indifference, as determined from the testimony of a police policy expert, a police captain, and the defendant police officer. *Id.* at 1290. Plaintiff's police policy expert testified that the always armed/always on duty policy presented serious safety risks and that if a police department adopted such a policy, it must train its officers on how to take police action in the different circumstances presented when the officers are off-shift because it was foreseeable that the lack of training would create a dangerous situation in which a shooting would occur. *Id.* at 1287, 1290.  The police department captain testified that the department made a conscious decision not to distinguish between off-duty and on-duty scenarios in the

44

training program because they are considered to be the same.  *Id.* at 1287, 1289.  The

captain acknowledged, however, that implementation of the policy had proved to be

fatal for some officers.  *Id.* at 1289.   The defendant police officer testified that he felt ill-

equipped to handle the encounter with the plaintiff because he did not have his

uniform, patrol car, or radio and had not received any training in handling such a

situation when he was off duty.  *Id.*  Under the fourth factor, the Tenth Circuit found that

there was a direct causal link between the use of excessive force against the plaintiff

and the inadequate training based on the police officer's testimony that he was

attempting to make a lawful arrest pursuant to the always armed/always on duty policy

when he shot the plaintiff.  *Id.* at 1291.

Unlike the circumstances in *Brown*, there is no specific evidence here

demonstrating that the City made a conscious decision to train police officers to

respond to calls involving mentally ill persons in the same manner as they would

respond to calls involving suspected criminal activity, which, according to plaintiff's

expert, would be contrary to recognized police procedures.  (Plaintiffs' Ex. H, at ¶¶D.4-

6); *see*, *also, Deorle v. Rutherford*, 272 F.3d 1272, 1282-83 (9th Cir. 2001)(stating that

the tactics employed against "an unarmed emotionally distraught individual who is

creating a disturbance" are ordinarily different from those involved in police efforts "to

subdue an armed and dangerous criminal" and recognizing that increasing the use of

force in the former instance may exacerbate the situation);  Michael Avery,

*"Unreasonable Seizures of Unreasonable People: Defining the Totality of*

*Circumstances Relevant to Assessing the Police Use of Force Against Emotionally*

*Disturbed People,"* 34 Colum. Hum. Rts. Law Rev. 261 (Spring 2003) (discussion of criminal justice authorities recognizing that police should not engage in threatening behavior with an emotionally disturbed person because fear of the police is likely to trigger a violent or aggressive response).

In *Carr v. Castle*, the Tenth Circuit rejected the plaintiff's claim that the City's inadequate training in the use of excessive force constituted deliberate indifference to the rights of others and caused the death of Mr. Carr.  Police officers shot Mr. Carr multiple times in the back after Mr. Carr threw some pieces of concrete at them that barely grazed one of the officers.  The Tenth Circuit found that the plaintiff did not provide any evidence that the City made a deliberate choice regarding any training; instead, the plaintiff merely enumerated the many ways in which he contended the training was inadequate.  337 F.3d at 1229.  The court distinguished *Allen* and *Brown* on the ground that those cases involved deliberate training choices that were likely to lead to a constitutional violation whereas in *Carr*, the plaintiff relied on the absence of specific training that could have helped the officers during their encounter with the plaintiff.  *Id.* at 1229-30.  The court also found that plaintiff had failed to satisfy the causation element for municipal liability because none of the alleged inadequacies in police training led directly to the use of excessive force against the decedent.  *Id.* at 1231.  The Tenth Circuit reasoned that the plaintiff's failure to show that police officers were actually trained to do the wrong thing was fatal to the plaintiff's ability to establish causation for municipal liability.  *Id.* at 1231-32.  The court further concluded that even if some inadequacy in training had been shown, the officers were not trained by the

municipality to shoot a suspect in the back after he no longer posed a threat. *Id.* at 1232.

The *Carr* decision thus appears to foreclose any basis for municipal liability under §1983 on a failure to train theory unless the plaintiff can show that police officers were specifically trained to act in a manner contrary to recognized police procedures and where such training is substantially likely to result in a constitutional violation.[18]

In *Olsen*, the Tenth Circuit reversed the district court's order granting summary judgment to Davis County on the plaintiff's failure to train claim. The failure to train claim arose from a single incident where the plaintiff-arrestee, who suffered from obsessive-compulsive disorder ("OCD"), had a panic attack en route to the jail. 312 F.3d at 1310. After arriving at the jail, plaintiff indicated on a medical pre-screening sheet, and told the pre-booking officers, that he had OCD and required medication to ward off panic attacks. *Id.* The pre-booking officers erroneously noted on the pre-screening sheet that plaintiff had "CDC", took plaintiff's medication away from him, and insisted that he remove his shoes and socks, pursuant to standard search procedures. *Id.* Plaintiff complied, but suffered another panic attack based on a fear of contamination from the dirty floor. *Id.* Davis County did not provide any training for handling individuals diagnosed with OCD. *Id.* Instead, while the County's booking procedures required screening arrestees for undefined mental illnesses or psychiatric disorders, the County allowed "health trained correctional deputies" to use their

---

[18]I note, however, that the *Carr* court did not discuss or distinguish *Olsen v. Layton Hills Mall*, another Tenth Circuit decision which was decided after *Allen* and *Brown.*

discretion in dealing with mental disorders. *Id.* Plaintiff claimed that Davis County failed to train the jail's pre-booking officers to recognize OCD and to handle individuals with OCD appropriately. *Id.* at 1319.

The *Olsen* court held that evidence that the pre-booking officers received no training on OCD, that OCD occurs in more than two percent of the population, and the "pre-booking officers' apparent ignorance to [plaintiff's] requests for medication," suggested that a violation of federal rights was a "plainly obvious" consequence of the County's failure to train and was sufficient to demonstrate the existence of a material factual issue about whether the County was deliberately indifferent because of its failure to train pre-booking officers about people with OCD. *Id.* at 1320 (internal quotations omitted). The court reasoned that the evidence that OCD is relatively common and that the County had procedures in place for dealing with inmates with psychiatric disorders "suggest[s] that the municipality may have had constructive notice of the illness' prevalence and consequences." *Id.* at 1320. The court also found that genuine issues of material fact existed about whether the County's inadequate training caused plaintiff to suffer another panic attack during the pre-booking process. *Id.* at 1320.

In light of *Olsen*, plaintiff's evidence here indicates that police training on officer interactions with the mentally ill was inadequate; that police contact with the mentally ill is a usual and recurring situation; and, the expert's testimony shows that the failure to provide adequate training is likely to result in situations where officers perceive a need to use force against mentally ill persons which can result in injury or death. Further,

Chief Velez's testimony that the City has adopted policies for dealing with the mentally ill, and that officers who do not receive appropriate training regarding contact with "persons with disabilities" may cause harm to such persons (Velez Deposition, at 66-67, 135) is evidence that the City had constructive notice that the alleged failure to train was likely to result in a constitutional violation.  This evidence is arguably sufficient under *Olsen*, although not under *Carr*, to support a finding that the lack of adequate training in police officer interactions with the mentally ill reflects deliberate indifference to an obvious risk that violation of mentally ill individuals' Fourth Amendment rights will occur.

Even if the plaintiff Estate has met its evidentiary burden under the first three elements of municipal liability under §1983, however, its failure to train claim founders on the fourth element.  Defendant Darress testified in his deposition that the City did not train him to use the pressure technique that he applied to Mr. Herring's neck that resulted in Mr. Herring's death.  (Darress Deposition, at 63) Accordingly, although Darress may not have been trained to know exactly how to react to an emotionally disturbed individual in the circumstances Darress confronted, the evidence establishes that Darress was not trained by the City to apply the technique that, according to plaintiffs' expert, caused Mr. Herring's death.[19]  *See*, *Carr*, 337 F.3d at 1232. Moreover, although Officer Carroll's act in spraying Mr. Herring with mace created the

---

[19]Darress also testified that he did not receive any training about different methods of contacting a "suspect's" neck that may cause a risk of serious injury or death.  However, the plaintiff Estate does not claim that the City's training program on the use of force generally is inadequate, and the evidence of record is insufficient to support such an inference.

need for defendants to use force against Mr. Herring, Officer Darress' application of thumb pressure to Mr. Herring's neck was the intervening act that caused Mr. Herring's death.

*See Olsen*, 312 F.3d at 1318 (recognizing that causation element for municipal liability in a failure to train claim asks: "'[w]ould the injury have been avoided had the employee been trained under a program that was not deficient in the identified respect?'")(quoting *City of Canton,* 489 U.S. at 391).

Accordingly, the City of Colorado Springs is entitled to summary judgment on the Plaintiff's Estate's claim of inadequate police training.

D.      Substantive Due Process claim

The plaintiff Estate's final claim is that the defendants deprived Mr. Herring of his life without substantive due process.  Plaintiff alleges that defendants' actions in causing the need to use force, which turned deadly, against an unarmed man who was alone inside his apartment, communicating with Officer Darress, and who posed no threat to the police until they kicked in his door, was shocking to the conscience.

Plaintiff cannot, however, maintain a due process claim based on the same facts that support the excessive force claim.  In *Graham*, 490 U.S. at 395, the Supreme Court held that "*all* claims that law enforcement officers have used excessive force-deadly or not-in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach." (Emphases in original)).

As discussed in footnote 12, *supra*, to the extent that Officer Carroll's use of OC spray against Mr. Herring was unrelated to police efforts to accomplish a "seizure" of the decedent, that claim is not actionable under the Fourth Amendment, but may be analyzed under the substantive due process clause.  *See Harrington*, 268 F.3d at 1191 (internal citations omitted)

To prove a violation of Mr. Herring's Fourteenth Amendment substantive due process rights, the Estate must establish that Officer Carroll's conduct was "conscious-shocking."  *County of Sacramento v. Lewis*, 523 U.S. 833, 846-848 (1998).   I find, as a matter of law, that defendant Carroll's deployment of a single burst of mace against Mr. Herring, at a distance of three to four feet, does not rise to the level of conscious shocking conduct necessary to trigger substantive due process protections.  Moreover, there is no evidence that Mr. Herring suffered any injury as a result, and mace has not been shown to permanently harm the recipient.  *See McCormich v. City of Ft. Lauderdale*, 333 F.3d 1234, 1245 (11th Cir. 2003)(citations omitted).

Accordingly, I grant summary judgment in favor of the defendants on the plaintiff Estate's Fourteenth Amendment substantive due process claim.

E.    Deprivation of Familial Association

Mr. Herring's three minor children claim that the defendant police officers deprived them of their constitutional right to familial association by causing Herring's death.

Children enjoy a right of familial association with their parents which is included in the substantive due process right of freedom of intimate association, and which is

"consonant with the right of privacy." *J.B. v. Washington Cnty*, 127 F.3d 919, 927 (10th Cir. 1997)(internal quotations and citation omitted).  To establish a deprivation of their constitutional right to familial association, the plaintiffs must show that the defendant officers intended to interfere with the children's relationship with Mr. Herring at the time the officers caused his death.  *Trujillo v. Bd. of Cnty. Comm's of Santa Fe Cnty.*, 768 F.2d 1186, 1190 (10th Cir. 1985).  In other words, the defendants' conduct must have been directed at the children's relationship with their father, with knowledge that the conduct would adversely affect that relationship.  *Id.; J.B.*, 127 F.3d at 927.

Plaintiff children concede that they are unable to show that the defendants intended to interfere with their relationship with their father when the defendants used force against Mr. Herring.  Plaintiffs argue, however, that Tenth Circuit law should be extended to allow for liability based on reckless conduct.  Plaintiffs maintain that all defendants knew that Mr. Herring had children and that the application of force against Mr. Herring in any disabling manner would impact those children.

Chief Judge Babcock rejected the same argument in *Hill v. Martinez*, 87 F.Supp.2d 1115,1119 (D.Colo. 2000).  In *Hill*, the court noted that although the Tenth Circuit has determined since *Trujillo* that some §1983 claims can be based on reckless behavior by state actors, *see, e.g. Archuleta v. McShan*, 897 F.2d 495, 499 (10th Cir. 1990)(assuming that reckless conduct could form the basis for a due process violation under §1983)*,* the Tenth Circuit reaffirmed in *J.B.*, 127 F.3d at 927, that plaintiffs in a familial association case must show that a state actor "directed" his or her challenged conduct or statement "at the intimate relationship with knowledge that the statements or

conduct will adversely affect that relationship" (internal quotations and citation omitted). *Hill*, 87 F.Supp.2d at 1119. Chief Judge Babcock found the language in *J.B.* "to maintain *Trujillo's* intent requirement." *Id.* I find Chief Judge Babcock's decision in *Hill* persuasive.

Moreover, in *Christianson v. City of Tulsa*, 332 F.3d 1270, 1284 (10th Cir. 2003), the Tenth Circuit dismissed the plaintiffs' familial association claim because plaintiffs had failed to allege "an intent to interfere with a particular relationship protected by the freedom of intimate association," as required by *Trujillo.*

Because the Tenth Circuit has not expressly or impliedly held that deprivation of the constitutional right to familial association may be based on reckless conduct, I am bound by the holding in *Trujillo*. The minor plaintiffs' claim is dismissed.

IV.

For the reasons set forth herein, it is

HEREBY **ORDERED** that Defendants' Motion for Summary Judgment [filed August 1, 2005] is **GRANTED in substantial part and DENIED in part** as follows:

(1) Plaintiff Estate's §1983 claims of unlawful warrantless entry, unconstitutional use of mace, deprivation of substantive due process, and deprivation of constitutional right to familial association against the individual defendants are **DISMISSED** in their entirety;

(2) Plaintiff Estate's §1983 claim against the City of Colorado Springs for inadequately training its police officers is **DISMISSED**;

(3) Plaintiff Estate's §1983 excessive force claim, which is based on the physical struggle between Mr. Herring and the police officers that resulted in Herring's death, is **DISMISSED** against defendants Carroll and Ambuehl only;

(4)   Defendants' summary judgment motion is **DENIED** as to the plaintiff Estate's excessive force claim against defendant Darress which is based on Darress' application of pressure to Mr. Herring's neck during the physical struggle with Herring; and,

(5)   Defendants Carroll, Ambuehl, the City of Colorado Springs, and the minor plaintiffs are **DISMISSED** from this action.

Dated February 2, 2005.

BY THE COURT:
s/ Patricia A. Coan
PATRICIA A. COAN
United States Magistrate Judge